WOMEN PRISONERS OF the DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

Civ. A. No. 93–2052 (JLG).

United States District Court, District of Columbia.

Dec. 13, 1994.

Peter J. Nickles, Caroline M. Brown, Tracy A. Thomas, Covington & Burling, Washington, DC, for plaintiffs.

Maria Amato, Teresa A. Ferrante, Asst. Corp. Counsel Correctional Litigation Section, Washington, DC, Baltimore, MD, for defendants.

## *OPINION*

JUNE L. GREEN, District Judge.

## I. INTRODUCTION

This matter is before the Court after a three-week trial, including the submission of approximately 900 exhibits and hundreds of pages of deposition and transcript testimony. On December 1, 1993, the Court granted the Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1) and 23(b)(2). The class is defined as *all women prisoners who are incarcerated in the District of Columbia correctional system as of October 1, 1993, and*

*all women prisoners who will hereafter be incarcerated in the D.C. correctional system.*

Women prisoners in the District of Columbia are incarcerated in three facilities: the Lorton Minimum Security Annex (Annex), the Correctional Treatment Facility (CTF) and the Central Detention Facility (Jail). The Annex is a collection of minimum security dormitories in Lorton, Virginia, which presently house approximately 174 women prisoners who are either held for trial, awaiting sentence or within 24 months of release. (R. 8–99; Pls.Exs. 621 at WP00034; 520 at DC0030902.) CTF is an 800 bed co-correctional facility in the District of Columbia consisting of a series of buildings which house approximately 271 medium custody, general population women prisoners. (Pls.Exs. 638 at 5; 520 at DC0030902.) The Jail is a medium to maximum security co-correctional facility in the District of Columbia housing approximately 168 women prisoners who are either serving sentences of less than one year or who are awaiting trial or sentencing. (Pls.Exs. 621 at WP00031, 520 at DC0030902.)

The Plaintiffs premise their claim for declaratory and injunctive relief on the following grounds: 1) women prisoners at the Annex, CTF, and the Jail are subject to sexual harassment in violation of the Fifth Amendment and the Eighth Amendment; 2) women prisoners at the Annex and CTF receive unequal opportunities to participate in prison programs in comparison to similarly situated men at other correctional facilities in violation of Title IX and the Fifth Amendment; 3) the provision of inadequate obstetrical and gynecological care offered to women prisoners at CTF violates the Eighth Amendment; and 4) the general conditions of confinement and fire hazards at the Annex and CTF violate the Eighth Amendment. Plaintiffs allege that the Defendants are liable for these constitutional violations under 42 U.S.C. § 1983. In the alternative, the Plaintiffs argue that virtually all of the Defendants' actions violate the Plaintiffs' rights under the D.C.Code §§ 24–442 and 24–425.

## II. FINDINGS OF FACT

### A. Sexual Harassment at the Jail, CTF and the Annex

The evidence demonstrates that there have been many incidents of sexual misconduct between prison employees and female prisoners in all three of the womens' facilities in this case. The level of harassment involves forceful sexual activity, unsolicited sexual touching, exposure of body parts or genitals and sexual comments. (R. 2–3.)

Within the D.C. Department of Corrections (DCDC) there is a general acceptance of sexual relationships between staff and inmates which creates a "sexualized environment" where "boundaries and expectations of behavior are not clear." (R. 5–78.) Based on conversations with DCDC employees, Mr. Howard Ray Jr., former administrator of CTF, stated, "[Y]ou just get this sense that [sexual misconduct] has always happened and it is always going to happen." (Ray Dep. I at 112.)

The most disturbing evidence of sexual harassment involves sexual assaults on women prisoners and the inadequacy of the Defendants' response to these attacks.[1] On October 31, 1993, at about 2:30 a.m., a correctional officer at the Jail, sexually assaulted Jane Doe Q while she was a patient in the infirmary. (R. 1–75 to 1–80.) The officer fondled her breasts and vagina, tried to force her to perform oral sex and then raped her. On December 9, 1993, at approximately 5:30 a.m., a correctional officer at CTF forced Jane Doe RR to perform oral sex on him while Jane Doe RR attempted to empty trash as part of a work detail. (R. 6–123 to 24.) The individual officers who assaulted Jane Doe Q and Jane Doe RR warned the women not to report the attacks. (R. 1–80; 6–126.)

Jane Doe Q and Jane Doe RR were placed in protective custody after they filed complaints. (R. 1–86; Pls.Ex. 502 at 11.) Jane Doe RR explained the problems with this arrangement: "[Protective Custody] is just

---

**1.** By Court Order, the women prisoners were permitted to use "Jane Doe" pseudonyms in this case in order to preserve their privacy and pro-
tect them from retaliatory actions by other inmates and by DCDC employees.

like being punished. [I]t's the same place where you go if you do something.... You stay on lock 23 hours every day.... I didn't [feel safe] ... because the person that is supposed to be watching us, [is] never at the desk hardly ... I don't consider that as being protected." (R. 6–132 to 6–133.)

In addition to rape and forced sodomy, women prisoners endure other varieties of sexual assault. In September 1993, a correctional officer at CTF grabbed Jane Doe W's buttocks and vagina while he escorted her from the medical unit where she had received prenatal care. (R. 1–36 to 1–38.) A CTF foreman tried to rub up against Jane Doe Z, and steward hands and different officers fondled women prisoners' breasts, legs, arms and buttocks. (R. 7–64.) Another CTF officer attempted on several occasions to fondle Jane Doe K's breasts, vagina and buttocks in the television room. (R. 6–110.) A teacher in the print shop would frequently try to pull Jane Doe OOO to him and kiss her. (R. 1–112 to 113.) An officer in the garment shop attempted to paw and kiss women prisoners. (R. 6–113.) [2]

Another problem at CTF and the Annex is a lack of privacy. Some male officers fail to announce themselves before appearing in areas where women undress. (R. 3–16; 1–56 to 1–58; Y. Jackson Dep. at 32–33, 43.) In addition, the structural design of CTF permits male inmates a view of women's rooms while the men are in the recreation yard or in their own cells. (R. 9–131.) Defendants claim that they allow women to cover the window while they are dressing, but the Court did not see evidence of a written policy to this effect. (R. 9–53; 9–131.)

Women prisoners at all three facilities are the targets of sexual comments. Steward hands and officers at CTF feel free to direct sexual comments at women prisoners. (R. 7–64, 66.) One officer in particular discovered that Jane Doe V was going to take a shower and said, "Well, you go ahead and do that and I'll be in there to stick my rod up in you." (R. 4–68.) Male prisoners and correctional officers at the Annex also direct sexually explicit comments toward women prisoners. (R. 1–117; 6–115.) Officers at the Jail verbally harass women by making derogatory references about women prisoners' breasts and buttocks. (R. 1–88.)

The DCDC has policies and procedures designed to address sexual misconduct. In the Defendants' Basic Regulations for all Employees, employees are cautioned not to become intimate with prisoners. (Defs.Ex. 26 at 5–6.) The Defendants also have created the Inmate Grievance Procedure (IGP) under Department Order No. 4030.1D (Pls.Ex. 117.), the D.C. Personnel Policy on the Employee and Inmate Relationships under Department Order No. 3350.1, (Defs.Ex. 53.), the Sexual Harassment in the Workplace policy under Department Order No. 3310.4B (Pls.Ex. 107.) and the Procedure for Handling Institutional Persons Suspected of Committing Crimes in the Institutions under Department Order No. 5410.1. (Defs.Ex. 27.) These regulations are supposed to be taught during a seven-week, pre-service training program and each year during a 40-hour in-service training program. (R. 8–125 to 26.)

Though the DCDC has established an Inmate Grievance Procedure, (R. 8–127 to 28), procedures for filing an IGP form are not posted on each one of the units as required, and requests for written reports present an obstacle for illiterate women who wish to file a complaint. (R. 2–44 to 2–45.)

These various policies and procedures are of little value because the Defendants address the problem of sexual harassment of women prisoners with no specific staff training (Stempson Dep. at 182–83.), inconsistent reporting practices, cursory investigations and timid sanctions. Since training is confined to sexual harassment in the workplace (Riddick Dep. at 92; Pls.Exs. 111, 115.) [3],

2. The print and garment shops are located at the Central Facility. Women prisoners from the Annex work in these shops to perform industrial labor.

3. The employee manual defines sexual harassment as "any unwelcome and/or repeated sexual advances, request for sexual favors, or any other verbal or physical conduct of a sexual nature. It is illegal when: 1) it is used as a condition of employment; 2) it is used as the basis of an employment decision; 3) it interferes with the

employees confront the harassment of women prisoners in different ways. Ms. Toni Perry, the former Director of the Women's Program at CTF, would present an inmate's allegations to the Director of the DCDC instead of reporting to the administrator of the facility. (Perry Dep. at 162.) Mr. James Derr, a staff assistant at the Annex, said that because there are corrupt people in the system "you almost have to be careful as to who you give your information to, ... whether they be higher-ups or superior to you or not.... I'm reluctant to give much information to anyone of our system." (Derr Dep. II at 88, 97–98.) Ms. Christine Welch, a substance abuse counselor at CTF, believes that an inmate would have to tell her something two or three times before Ms. Welch would report it. (Welch Dep. at 62–63.) When a woman prisoner complained to Ms. Welch about an instance of sexual harassment, she told the woman prisoner to "just quit her job and program, because she really didn't need to work." (Welch Dep. at 63–64.)

Reports of sexual misconduct also do not remain confidential. (Perry Dep. at 164; R. 4–50.) After Jane Does Q and RR reported their assaults, the incidents quickly became a matter of public knowledge among prisoners and staff. (R. 1–86; 6–137.) Officers spoke with Jane Doe RR about her attack and gave her the impression that they regarded it as a "joke" or "gossip." (R. 6–137.)

The Defendants do not adequately investigate the incidents of sexual misconduct because there is no policy and because the investigations are not taken seriously. (Krull Dep. at 227; Derr.Dep. II at 105–06; Y. Jackson Dep. at 161.) If the DCDC does not have first-hand knowledge of an incident, Mr. William Plaut, the Deputy Director of Operations and Acting Deputy Director for Programs,[4] believes that they must wait for

the conclusion of a police investigation or the conviction of the accused employee before they can take any action. (R. 8–132.) On many occasions while Mr. John Henderson worked as the Administrator of the Jail, police would not respond to his initial call to investigate and he would not make any further attempts to contact them or conduct an independent investigation. (Henderson Dep. at 146.) In a case involving an allegation that an officer had impregnated an inmate through coerced sexual intercourse, Mr. Henderson referred the case to the police and did not learn of the results until four months after the police concluded their investigation. (Henderson Dep. at 94–95, 108–110.) Mr. Henderson did not conduct his own investigation or discuss the case with the accused officer who was eventually reassigned to the Occoquan Facility. (Henderson Dep. at 108–10, 113–15.)

Ms. G.H. McCathorine[5], Associate Director of Programs for the DCDC, responds to complaints by assigning Deputy Warden L.C. Jones[6] to a case and then she waits for the results of his investigation. (McCathorine Dep. at 242.) When Jane Doe RR discussed incidents of sexual misconduct with Deputy Warden Jones he discouraged her from talking to him too often because people would view her as an informer. (R. 6–144 to 145.) He also assured Jane Doe RR that if she did not provide any names to one of the Plaintiffs' lawyers, he would work toward getting her released from jail. (R. 6–144.) Though Mr. Jones himself had an allegation of sexual misconduct pending against him, his superior Ms. McCathorine claimed that she was not aware of this. (Jones Dep. at 169–70; McCathorine Dep. at 230.) Mr. Jones claims to have certain difficulties determining whether harassment has occurred. Concerning an allegation against one officer,

work atmosphere or performance of an employee."

4. Mr. Plaut held the position of Associate Director for Institutions when he dealt with some of the incidents of sexual misconduct alleged in this case.

5. Some documents in the record refer to Ms. McCathorine by her former name, Ms. Gwen Washington. (R. 8–83.)

6. The record contains references to Mr. Jones in his position as Lieutenant and Captain. Mr. Jones, however, is now the Acting Deputy Director for Operations at the Correctional Treatment Facility. (R. 8–145.) Mr. Plaut referred to him as Deputy Warden Jones. (R. 8–146.)

he expressed disbelief that a man the officer's age would be attracted to an openly homosexual inmate.[7] With respect to harassment in the culinary section of CTF, he believes that he cannot adequately conduct an investigation without a camera. (Jones Dep. at 31.)

Though Ms. Jennie Lancaster, a jail administrator and the Plaintiffs' expert penologist, has been able to reach a conclusion in approximately 90 percent of all sexual harassment cases she has confronted, the record demonstrates that the Defendants often fail to reach any conclusions in their investigations. (R. 5–74, 76.) Jane Doe Q reported her attack to the administration and the police, but at the time of trial, she did not know the results of the investigation or whether any action was taken against the officer who assaulted her. (R. 1–85 to 86.) Jane Doe RR filed an IGP, (Pls.Ex. 502), and later filed criminal charges yet neither the CTF administration nor the police has informed Jane Doe RR about the status of the investigation into the incident; and to her knowledge, no disciplinary action has been taken against the officer who assaulted her. (R. 6–136.) Jane Doe OOO, along with five other women, complained to the Administration about sexual harassment by a teacher in the Print Shop yet there is no evidence that the administration took corrective action. (R. 1–114.) Jane Doe K complained to CTF staff about the incidents of CTF officers pawing women prisoners but the administration took no action against the officers. (R. 6–111.)

When the evidence is reduced to a dispute between an inmate's allegation and an employee's version of events, the Defendants generally side with the employee. (R. 8–133 to 34; *See, e.g.,* Pls.Exs. 74, 76, 77, 79, 86.) A typical example is the administration's response to Jane Doe W's IGP in which the administration summarily concludes that her allegations "could not be validated." (Pls.Ex. 69 at 2–4; R. 1–40, 43.)

When the Defendants do suspect that an employee is guilty of sexual misconduct they possess a range of sanctions to use against an employee, (Defs.Ex. 25), but they often simply reassign the employee to a different facility. (R. 5–74 to 5–76.) Mr. Plaut stated,

There are ... cases where we believe the inmate. In fact, the inmate's story in some cases is more credible than the employee's story, but you cannot take adverse or corrective action against the employee because you believe the inmate over the employee. In cases like that we relocate the employee and make sure the employee does not come in contact with that inmate, does not work in that institution.

(R. 8–134.) Mr. Plaut stated that he has personally reassigned "many, many" officers who he believed may have been engaged in sexual misconduct. (R. 8–135.) The officer who assaulted Jane Doe W continued to work on Jane Doe W's unit after the incident (R. 1–47) and was transferred to the Maximum Security Facility on May 8, 1994. (Pls.Ex. 675.) Jane Doe K complained to staff about the harassment by the officer in the garment shop (R. 6–113; Pls.Ex. 66 at 5.) and that officer was transferred to another post. (R. 8–153, 6–114.) When Yvette Jackson, a correctional officer at the Annex, reported the problem of an officer entering women's areas without announcing his presence, Captain Larry Corbett assured Jackson that he would try to keep the officer from coming up to the Annex as much as possible. (Y. Jackson Dep. at 38.)

Reassignment does not always occur. When Jane Doe RR returned to CTF in May 1994 the officer who assaulted her still worked at the facility. (R. 6–135.)

The effect of sexual harassment on women prisoners is profound. The abuse has a significant impact on a woman's concentration, and it lowers confidence and self-esteem. (R. 2–57 to 2–58.) It leads to irritability, anxiety and nervousness. Women may be angry that the incident is happening and fearful that they will be continually exposed to it. (R. 2–58.) Women prisoners who experience sexual harassment report significant depression, nausea, frequent headaches, in-

---

**7.** The specific testimony of Lieutenant Jones was as follows: "This man is 60 some years old. I'm saying, wait a minute. But granted, now, I'll give you the fact that maybe he might be turned on by that fag, I don't know. I just do not. I find it hard to believe." (Jones Dep. at 142.)

somnia and feelings of fatigue. (R. 2–58.) Those who report the harassment often experience increased stress and may end up becoming isolated from other women in the institution. (R. 2–58.) Women can feel self-doubt, and disillusionment at the failure of the organization to protect them. Women prisoners lose confidence in the system and may decide not to complain about additional incidents. (R. 1–118; 6–115.)

For women who have a history of sexual abuse the harassment often brings back memories of the prior abuse.[8] (R. 2–61 to 62.) This can lead to severe depression, reinforcement of a "victim" self-image and a belief that, as in childhood, they have no control over their lives. (R. 2–61.)

### B. Obstetrical and Gynecological Care at CTF

Women prisoners at CTF, like most female inmates, experience a higher rate of illnesses than the general population. (R. 3–52 to 3–53.) Specifically, women inmates have a greater risk of contracting sexually transmitted diseases such as syphilis, AIDS,[9] or gonorrhea, and other illnesses such as cervical cancer and sterility due to infection. (R. 3–53.) The reason for the high rate of disease stems from the fact that the lifestyle of a typical woman prisoner does not include good health habits. (R. 3–52.)

Doctors should examine people in a "high risk" health category much more frequently and they should also anticipate complications, particularly in the case of prenatal patients.

(R. 3–57 to 3–58.) Failure to monitor these women closely results in an unnecessary degeneration of their health and the health of a fetus if they are pregnant. (R. 3–58, 3–60.)

Adequate gynecological care begins with a thorough examination. This includes a pelvic examination, a thorough gynecological-obstetric history, a PAP smear, cultures for gonorrhea and chlamydia, a test for syphilis, a thyroid examination, breast examination and an examination of the rectum, abdominal contents and pelvic organs. (R. 3–59.) In certain instances a test for Hepatitis B should be done. (R. 3–59–60.) Failure to give timely examinations can shorten a patient's life in the case of AIDS, or it can result in infertility in the case of chlamydia and gonorrhea. (R. 3–63 to 64.) It is best if an institution establishes a list of necessary exams as part of a protocol for health care providers to follow. When an organization faithfully follows a protocol, people "develop a habit of doing things properly." (R. 3–72.)

The DCDC policy states: "[A]ll new arrivals . . . will be seen within 24 hours to determine the health status of the resident and to take any steps necessary to protect the health and safety of the resident and general population." (Pls.Ex. 563.) Also, "[i]t is the policy of Health Services to provide clinically appropriate periodic health examinations and follow-up care to inmates under the [DCDC]." (Pls.Ex. 483.)

These policies are not followed at CTF.[10] (R. 3–76 to 3–77.) Women prisoners during intake are not given pelvic exams or breast

---

8. Dr. Susan Fiester, Plaintiffs' expert in the area of sexual harassment and sexual misconduct, testified that among the general female incarcerated population, between 70-to-80 percent have been sexually abused at some point in their lives. Dr. T.A. Ryan, the Defendants' expert penologist, testified that "in large measure, a female offender population will come from a history of abuse." (R. 11–40.)

9. The Commission of Public Health, Office of Sero Prevalence/Preventive Health Care, conducted a study utilizing CPH protocol of random sampling. The study demonstrated that 9.9 percent of the females tested positive for HIV. (Pls.Ex. 660.) AIDS patients run a higher risk of developing opportunistic infections such as pneumonia or vaginal yeast infections. (R. 3–53 to 3–54.)

10. Defendants claim that pelvic examinations, pregnancy tests, PAP smears and tests for sexually transmitted diseases are not routinely performed at CTF because they are supposed to be done at the Jail. (R. 13–128 to 130.) At CTF, a physician's assistant reviews the medical record for missed tests and initiates tests for pregnant prisoners. (R. 14–95 to 96.) But an investigation of medical care at the Jail indicates that the Defendants often did not conduct these tests. The Special Officer's Report on Medical Care at D.C. Jail, *Campbell v. McGruder*, C.A. No. 1462–71 (D.D.C.), February 2, 1994, at 42–43. Dr. Charles Hall, an OB/GYN physician at CTF claimed that he was not aware of these findings. (R. 14–37 to 39, 42 to 43.)

exams. (R. 14–12.) Women must also request PAP smears through sick call. (R. 14–12.) Out of a sample of 70 women prisoners, 9 did not have any documented PAP smears. (R. 3–67.) In addition, there was no documentation as to the last PAP smear these women had. (R. 3–67.) Approximately 12 women out of the sample of 70 were HIV positive and none of these women had PAP smears done at six-month intervals. (R. 3–73.) PAP smears should be taken every one or two years for non-risk patients. (R. 3–67, 14–117.) But high risk patients, such as women with advanced stage HIV or previous abnormal PAP smears, should be checked at least every six months. (R. 14–117.) A woman who is compromised with AIDS can go from a negative PAP smear to invasive cancer within a year. (R. 3–70.)

Defendants do not routinely test women prisoners at CTF for sexually transmitted diseases. (R. 3–74; 14–12.) In 7 out of 47 reviewed cases, either a gonorrhea culture or chlamydia culture was missing. (R. 3–74.) In some cases women were not tested for syphilis. (R. 3–74.) Failure to screen for chlamydia may result in sterility for a woman or eye infections and pneumonia for a newborn baby. (R. 3–74 to 3–75.) Advanced gonorrhea may result in sterility, abscessed ruptures and peritonitis. (R. 3–75.) Syphilis may lead to an aortic aneurysm, dementia or psychoses.[11] (R. 3–76.)

Even when women prisoners receive medical tests, the follow-up care of inmates at CTF is inadequate. In one instance a woman with an abnormal PAP smear declined further testing because she believed that she would be released soon and would get better care from a private doctor. (R. 3–78.) She was not released, however, and received the tests three months after the time prescribed.

(R. 3–78.) In another case, doctors performed a biopsy on a woman after a very abnormal PAP smear. The woman was subsequently released from custody without the record indicating that any medical advice was given to her. (R. 3–78.)

The Plaintiffs presented women prisoners who provided further evidence of the Defendants' failure to render adequate follow-up care. Jane Doe II is a CTF prisoner who is HIV positive and suffers from the human papilloma virus (HPV).[12] (R. 2–158, 172.) While at CTF in September 1992, Jane Doe II experienced abnormal vaginal discharges and painful discharges of fluid from her left nipple. (R. 2–158, 166.) At her initial screening, she complained to a CTF physician's assistant about her breast problem. (R. 2–164.) On September 16, 1992, she saw Dr. Charles Hall at the CTF infirmary. (R. 2–165.) Dr. Hall prescribed medicine for the vaginal discharge and scheduled an appointment for her at the Howard University surgery clinic at the Jail approximately three weeks later. (R. 2–166.) She missed the next two appointments because the Defendants were late in transporting her. (R. 2–166 to 167.)

Despite her continued complaints to CTF medical staff[13] and a worsening condition, Jane Doe II did not receive an examination until November 1993, more than one year after complaining about her condition. (R. 2–167 to 169.) Doctors performed a biopsy on March 23, 1994 at D.C. General. (R. 2–170.) The five month wait for the biopsy occurred because CTF staff on approximately four occasions scheduled her for the wrong medical facility. (R. 2–170.)

11. On the subject of testing, no test has been as regularly administered as the tuberculin skin test. (R. 3–70.) Dr. Major, the Plaintiffs' expert in the field of obstetrics and gynecology, stated that the reason for this might be that tuberculosis poses a threat to prison personnel as well as other inmates. (R. 3–70 to 71.)

12. This is a virally caused, sexually transmitted disease. It results in warts on the surface of external and internal genitals. It is treatable but potentially dangerous. Of the fifty or sixty strains of the virus, about eight to ten are pre-

malignant. Very often it shows up on a PAP smear. (R. 3–79.)

13. The lack of confidentiality at CTF convinced her not to participate in the sick call procedure. Sick call involves a group of physician's assistants who make daily triage rounds on the units and examine inmates who have placed their names on a sick call list. The first time Jane Doe II participated in this procedure a physician's assistant placed her file on a cart in open population. (R. 3–22.)

The Defendants' medical expert and Dr. Charles Hall believe that the Defendants' response to Jane Doe II's breast problem did not meet minimal medical standards. (R. 14–26 to 27; 14–119 to 120.) According to Dr. Major, Jane Doe II's breast discharges warranted only a simple cytology smear of the drainage which could easily have been performed at the CTF clinic instead of the clinic at the Jail. (R. 3–80 to 3–81.)

In May 1993, she requested a PAP smear from the CTF medical staff because she discovered lesions on her buttocks and experienced irregularities in her menstrual cycle. (R. 2–171.) She did not receive a test until November 1993 and the results of the test were abnormal. (R. 2–171 to 172.) In January 1994, Jane Doe II received a culdoscopy which revealed no abnormalities.[14] (R. 2–172 to 173.) By June 1994, she still had not seen a gynecologist at CTF since the PAP smear and culdoscopy. (R. 2–173.)

The case of Jane Doe V provides another example of a breakdown in medical treatment. In June 1993, Jane Doe V requested a PAP smear and a mammogram because a physician's assistant at the Jail informed her that she had polycystic breasts. (Pls.Ex. 254 at 4.) Three separate physician's assistants at CTF told her that she could not receive a mammogram because she was not thirty-five years old. (R. 4–94.) She finally saw a gynecologist about her breast in September 1993 but still did not receive a mammogram. (R. 4–95.) Only after Jane Doe V threatened to file a complaint did she receive a mammogram. (R. 4–95.)

Defendants' policy on health promotion and disease prevention states: "Health Services will provide health education and training in self-care skills to all inmates...." (Pls.Ex. 570.) The health education at CTF, however, is "grossly inadequate." (R. 3–86.) Dr. William Hall, Assistant Director for Health Services, stated that the DCDC does not have any pamphlets or videos that deal specifically with obstetrical and gynecological

care. (William Hall Dep. 181–82.) The only evidence of health education that Plaintiffs' medical expert found, was a breast self-examination chart located on the back of one of the rooms in the infirmary. (R. 3–86 to 3–87.)

According to Dr. Major, records at CTF demonstrate "too many records of refusal of treatment." (R. 3–84.) The number of women refusing treatment could be reduced by proper counseling as to the importance of treatment. (R. 3–84.) In one case, a pregnant woman with syphilis refused treatment for two months simply because she did not like injections. (R. 3–84 to 3–85.) Education is particularly important in the area of breast self-examinations where over the past ten years more breast lumps have been discovered by women than by their doctors. (R. 3–88.)

The DCDC has a written policy which requires the Defendants to provide comprehensive medical care and counseling to all pregnant women prisoners. (Pls.Ex. 2.) But even in 1994 they recognized a "lack of gender specific care in the areas of prenatal and postnatal education and care." (Pls.Ex. 434 at 5.)

In the area of abortion counseling, the written policy of the DCDC provides: "The Institution Administrators shall provide each inmate with medical and social counseling to aid her in making the decision to have an elective abortion. Religious counseling will be made available should the inmate desire it." (Pls.Ex. 5.) Women prisoners receive abortion counseling from Ms. Marydot Thomas, a licensed nurse, as well as from the clinic performing the abortion. (R. 13–89.)

In rendering prenatal care, the Defendants have not followed any written protocol.[15] (R. 13–99.) A protocol or use of a Problem Oriented Prenatal Risk Assessment (PO-PRAS) form is a crucial element of prenatal medical treatment. (R. 3–94, 14–129.) This

---

14. A culdoscopy is the direct visual examination of the female viscera through an endoscope introduced into the pelvic cavity through the posterior vaginal fornix. *Encyclopedia and Dictionary of Medicine, Nursing and Allied Health* 258–59 (2d ed. 1978.)

15. In addition, Dr. Clark found lapses in prenatal documentation which caused him concern because documentation is a crucial part of medical care. (R. 14–167 to 168.)

form takes health care providers through a step-by-step approach to treating a prenatal patient. Dr. Charles Hall, who is responsible for prenatal care at CTF, told Dr. Major during an interview that there was no written protocol at CTF and that the "protocol" was "in his head". (R. 3–95–96.)

After Dr. Major's interview with Dr. Hall, Dr. Eliza Taylor asked Dr. Hall to prepare a prenatal protocol for CTF. (Pls.Ex. 457; Charles Hall Dep. at 122–23.) The protocol, however, is not nearly sufficient. (R. 3–97.) For example, it requires an Alpha Feto Protein test "at appropriate time," which might mean one thing to a doctor and another thing to a nurse practitioner or physician's assistant. (R. 3–98.) It does not indicate when or how an ultrasound test should be performed. (R. 3–98.) The protocol vaguely prescribes "tests, management and referral as needed based on the judgment of the health care provider." (Pls.Ex. 457.) [16]

Dr. Major found eleven instances where women did not receive prenatal care until after two or more months from the start of pregnancy. (R. 3–99 to 3–100.) General standards require prenatal care to commence no later than two months after pregnancy begins. (R. 3–99.) Care within the first two months enables doctors to ameliorate gestational problems such as anemia, hypertension, diabetes and poor weight gain or infant growth. (R. 3–101.) The standard of care for prenatal appointments is monthly visits for the first six months, bimonthly visits for the seventh and eighth months and weekly visits for the last month. (R. 14–126.)

The experiences of Jane Doe QQQ and Jane Doe L offer examples of inadequate prenatal treatment. On a Saturday in January 1994, Jane Doe QQQ experienced vaginal bleeding and was sent to D.C. General where a nurse informed her that she had to wait in the lock-up. (R. 4–23 to 24.) Jane Doe QQQ refused to go because as she explained: "I believed I was threatening a miscarriage, and [in] lock-up, I would have been on a metal bed without a mattress and I would have

been in a cell ... for five or six hours." (R. 4–24 to 4–25.) She finally returned to CTF that night and did not see a doctor until the following Monday. (R. 4–26.)

Jane Doe L was five months pregnant when she arrived at CTF on March 22, 1993. (R. 2–134.) She received two examinations and a sonogram before delivery even though she made requests for a prenatal examination through sick call. (R. 2–136 to 2–138; 14–20 to 14–24; Pls.Exs. 681, 682, 683.)

On the night before delivery, Jane Doe L experienced labor pains and was taken to the hospital. (R. 2–139.) But D.C. General sent her back because her water had not broken and she was not dilating. (R. 2–139 and 140.) Despite the fact that her contractions were five minutes apart, the staff at CTF placed her in handcuffs and leg shackles and sent her to a prescheduled court appearance. (R. 2–141 to 142.) The Marshals at the courthouse sent her back to CTF because she could not walk due to labor pain. (R. 2–143.) At CTF, she spoke to a nurse who knew about her trip to D.C. General but only offered her some aspirins and told her to prop her feet up and rub her stomach. (R. 2–143 to 2–144.) Jane Doe L went to her cell and delivered her baby shortly thereafter. (R. 2–146.) Jane Doe L had not yet purged the afterbirth from her body when guards placed her in handcuffs and leg shackles and sent her by ambulance to D.C. General. (R. 2–147.)

Jane Doe L's experience with shackling is not unusual. When Defendants transport pregnant women prisoners on medical visits they customarily place women in leg shackles, handcuffs and a belly chain with a box that connects the handcuffs and belly chain. (R. 4–14; 6–98 to 6–99; 2–141 to 2–142; 2–147; 1–61 to 1–62.) A physician's assistant stated that even when a woman is in labor "their ankles and their hands are cuffed." (Ali Dep. at 162–63.) Leg shackles are the least inconvenient method of shackling and chest boxes, arm shackles and wrist shackles

---

**16.** Another related example of inadequate medical documents is the physical profile which Defendants use at CTF. (Pls.Ex. 646.) The document displays a front and back sketch of a man's anatomy. On the sketch displaying a frontal view, the genitals are crossed out. On the sketch which provides a rear view someone wrote, "Use this as a female." Dr. Major found this document in about 20 to 25 percent of instances when the chart was used. (R. 3–138 to 3–139.)

increase the chance for injury. (R. 4–7.) Deputy Warden Jones stated that he does not use leg shackles on a woman in her third trimester of pregnancy "because there's a possibility she might trip." (Jones Dep. at 16–17.) Dr. Major stated that unless a pregnant prisoner is assaultive or an escape threat the need for shackling is unnecessary. (R. 4–6 to 7.)

In the area of prenatal nutrition, the Defendants' written policy states: "Pregnant females shall be placed on a nutritionally balanced diet that includes milk and a late evening snack.... Any dietary recommendations made by D.C. General Hospital shall be followed." (Pls.Ex. 2 at 2.) Records of some women reveal abnormally low weight gain which could possibly mean that the nutritional needs of women have not been met. (R. 3–112; *See* R. 1–59 to 1–60.) On one occasion, Defendants refused to give a dietary supplement even though D.C. General prescribed it. (R. 4–27 to 4–30, 14–28.) There were also incidents where the CTF pharmacy ran out of vitamins due to storage problems. (R. 3–113.)

In other areas of prenatal care, the Defendants offer parenting classes once a week, prenatal exercise classes two days a week for an hour (as of May 1994) and a "therapeutic community" (as of April 1994) in which counselors and Ms. Linda Studevent, the unit manager for pregnant women, hold group discussions with women prisoners on issues related to pregnancy. (R. 9–121 to 23, R. 4–11 to 4–13.)

Defendants, however, provide post-partum women prisoners with almost no time to visit their babies while the babies board at D.C. General. (R. 4–18; 6–100.) The record shows that mothers are transported to D.C General for visits only when the baby is critically ill. (R. 9–141 to 42; Pls.Ex. 48 at 6, 7, 9, 11, 13.) The Defendants have no policy statement on visitation between inmates and their babies. The evidence indicates that women need to hold their children at each feeding time. (R. 3–121 to 122.)

In cases where the infant is critically ill, the infant has died or when the mother is depressed because of child placement, post-partum counseling is crucial in alleviating stress or depression. (R. 3–128 to 129.) Defendants offer post-partum counseling through Ms. Loretta Brantley, a supervisory social worker. (R. 10A–4 to 5 (Morning Session).) Ms. Brantley has worked on the pregnancy unit since May 1994 and supervised the previous pregnancy counselor Ms. Pearl Jackson. (R. 10A–6 (Morning Session).)

Perhaps the most important post-partum concern is child placement while a mother is incarcerated. The Defendants recognize that the separation of women prisoners from their children often creates a trauma more severe than that experienced by male prisoners. (R. 8–115, 9–10, 11–51.) The Defendants' policy on child placement is as follows: "Arrangements for placement of any child born while the mother is in custody should begin as soon as the pregnancy is known, but prior to delivery." (Pls.Ex. 8 at DC0000090.) The evidence shows that child placement counseling needs to occur by at least the second trimester. (R. 3–116.) At trial, the Defendants claimed that as of January 1994 child placement counseling is available for pregnant women prisoners once a week. (R. 9–125, 127; R. 10A–4 (Morning Session).)

By 1994, however, Defendants recognized that they did not offer enough programming in the area of boarder babies, child custody and foster care. (Pls.Ex. 434 at DC0027809.) Jane Doe L testified that at no point during her pregnancy did anyone at CTF counsel her on child placement. (R. 2–151.) Jane Doe QQQ tried to make arrangements for the placement of her child but the counselor responsible for child placement "seemed unconcerned and unwilling to assist [her]." (R. 4–32.) Jane Doe QQQ testified that a woman she briefly met once will care for the baby. (R. 4–32.)

Plaintiffs' Exhibit 458 lists seven inmates' babies who boarded at D.C. General in 1993. The previous year, 16 babies of women prisoners boarded at the hospital. (R. 10A–33 (Morning Session).) Dr. Major stated that in his experience with correctional institutions he had never seen that many boarder babies. (R. 3–119 to 120.) He "refused to believe that this many mothers did not want their

children placed properly." (R. 3–120.) Dr. Charles Hall has not spoken to anyone within the DCDC about the issue of boarder babies. (R. 14–10.)

Overall, many of the problems with obstetrical and gynecological care can be traced to inadequate staffing, problems with transportation and a lack of consultation between CTF and D.C. General. As of November 1993, Dr. Eliza Taylor stated that the physician shortage is "quite apparent." (Pls.Ex. 394 at DC0025016.) Even when staff is available, the Defendants too often fail to transport women prisoners to medical appointments. (Pls.Ex. 389 at DC0024258–63; Ali Dep. at 103–04.) A lack of transportation caused Jane Doe QQQ to miss two prenatal appointments (R. 4–20.), kept Jane Doe K from approximately four appointments (R. 6–96.) and prevented Jane Doe II from being examined on two occasions. (R. 2–166 to 167.)

The Defendants' Monthly Medical Reports offer further proof that the lack of transportation is a longstanding problem. (Pls.Ex. 394.) In September 1992, 151 women were scheduled for OB/GYN appointments, 91 are listed as not receiving transportation and 9 refused to go. (Pls.Ex. 394 at DC0025220.) The Chief Medical Officer of CTF at that time, Dr. Lynette E. Mundey, expressed concern about the "significant number of no shows" and stated that the escort system had "not worked effectively." (Pls.Ex. 394 at DC0025218.) In November 1992, 148 women were scheduled for OB/GYN appointments and 39 were listed under "no transportation." (Pls.Ex. 394 at DC0025201.) In October 1993, 100 women were scheduled for OB/GYN appointments but only 76 were seen and in August 1993, 118 women prisoners had OB/GYN appointments and 71 were seen. (Pls.Ex. 394 at DC0025033 & DC0025062.) Defendants' records fail to explain the reasons for these women not being examined.

Defendants hoped to improve the provision of medical care by creating a Memorandum of Understanding between D.C. General Hospital and the DCDC. (Pls.Ex. 455) It requires administrative and clinical principals of each facility to attend meetings at inter-

vals of no more than four months. (Pls.Ex. 455 at DC0030944.) The Memorandum also provides for continuity of care and states that all inmate-patients "referred to [D.C. General] for ambulatory clinics will be seen with dispatch and given priority status to other patients." (Pls.Ex. 455 at DC0030946.) Defendants do not follow this Memorandum of Understanding. (R. 3–138, 14–158.) Dr. John Clark, Defendants' medical expert, found that there was a "lack of adequate communication and coordination at three levels. . . . Medical to Medical (i.e., Doctor to Doctor), Nurse to Nurse (DCGH to CTF) and DCGH Medical to DOC–CTF Custody Staff." (Pls.Ex. 667 at 12.) Dr. Charles Hall of CTF has had no discussions with D.C. General concerning the general quality of care that is provided to all women prisoners who are treated at D.C. General. (Charles Hall Dep. at 151.)

## C. Physical Conditions of Confinement at CTF and the Annex

### 1. Housing Conditions

#### a. CTF

The DCDC created CTF in response to a need for an 800–bed facility that would offer intensive treatment and transitional services for special needs offenders. (Pls.Ex. 338 at DC0018947.) The Defendants intended to divide the facility into three areas: Reception and Diagnostic (288 beds); Substance Abuse (256 beds), and Mental Health (256 beds). (Pls.Ex. 338 at DC0018947.) This plan changed in 1992 when the Defendants increased the number of female offenders to be placed at CTF and delayed the implementation of the Mental Health Program. (Pls.Ex. 338 at DC0018947–48.) This decision was made for primarily financial reasons. (R. 8–9.) In a February 27, 1992 letter to Deputy Mayor Robert Mallett, Mr. Ridley explained his request to change the mission of CTF:

Unfortunately, recent developments associated with the budget and the growing population has forced the department to reconsider full implementation of the Mental Health Program at the CTF. The Federal Bureau of Prisons informed the department that it can no longer house approxi-

mately 700 inmates from the District. The anticipated increase in population by 700–800, as a result of the Bail Reform Act, and assurance that existing court orders are complied with are a few of the problems forcing the department to consider increasing the number of females at the CTF. *More importantly, the department must consider all cost saving efforts as a means of meeting its budget mark.*

(Pls.Ex. 338 at DC0018948) (emphasis added). In assessing the "Pros" and "Cons" of this move, the first "Pro" listed was: "Assist the department in reducing its budget by eliminating 71 positions with a savings of $3,267,748." (Pls.Ex. 338 at DC0018949.) One of the "Cons" was "[a] small number of individuals in the community may respond in a negative manner concerning the movement of women from a campus-like setting to a closed-in setting. This can be justified in that the availability of more comprehensive services and privacy outweigh the continued placement at Lorton." (Pls.Ex. at 338 at DC0018950.)

CTF is constructed as a series of multi-level buildings all connected by inside walkways. (Pls.Ex. 638 at 5.) Administration, medical and visiting facilities are located in Building B; food service is located in the basements of Buildings A and B; central services and a gymnasium are located in Building B; reception and diagnostic services are located in Building C (which houses some females); housing and treatment facilities for substance abuse are located in Building D. (Pls.Ex. 638 at 5.)

Women prisoners are housed in Building E. (Pls.Ex. 638 at 5.) Building E contains 4 housing units and there are 64 cells in each housing unit. A single unit takes up an entire floor and is symmetrically divided into an "A" side and a "B" side. Each side has a day room and then an L shape to the building of two wings of cells opening off the day room and each of the legs of the L has two levels of cells in it. There are eight cells on each level.

Each cell has a single bed with a toilet, a slot type window on an outside wall and registers for air circulation. (R. 6–53.) The bed is fastened to a masonry outside wall. (R. 6–53.) The cells are not insulated and those at the far end have two outside walls which make them the coldest rooms. (R. 6–53.)

As Mr. Paul Quander, the Executive Deputy Director for the DCDC said of the facility, "CTF is designed for controlled movement.... Elevator control, door control, electronics, computer generated. Things of that nature. It's different from what we have in our other facilities." (R. 8–67.) Ms. Lancaster added, "This is not the type of facility that would be designed for a general population female institution and is not designed in my opinion to house a general prison population...." (R. 5–45.)

Despite the fact that it is a new facility, CTF has problems. The facility is unable to generate a sufficient amount of heat in winter. (Pls.Ex. 145 at DC0003388; Pls.Ex. 159 at DC0003820.) The failure of steam coils in the air handling mechanism and lack of insulation in the cells cause low cell temperatures. (Pls.Ex. 638 at 7–8; R. 6–55 to 56, 72.) The steam coil malfunction forced the administration to shut down the outdoor air intake and thus prevent the entry of fresh air and the removal of contaminants. (Pls.Ex. 638 at 7; R. 6–56.) Jane Doe V testified:

Last winter, my first winter in CTF, I experienced icicles on [the inside of] my windows, extremely cold weather, blowing puffs out of my mouth and nostrils. There were mornings when we would have to get extra blankets if they would bring them up to us. We would have to put on layers and layers of clothes just to stay warm.[17]

(R. 4–89.) Low temperatures greatly increase the incidence of illness from cold or flu. (R. 6–54; Pls.Ex. 159 at DC0003820.)

Jane Doe K notified the Defendants about the heating problem in a letter to Ms. Parrott–Fonseca asking for the Administration

---

**17.** Jane Doe II also stated that during the winter months there was ice on the inside of her windows, as well. She, however, claimed that nobody gave her extra clothing or blankets. She stayed warm by wearing "two and three jumpsuits, and robes and pajamas all at the same time." (R. 3–18.)

to fix the problem. (Pls.Ex. 160 at DC0003826–27.) She wrote:

I come to you expressing the dire need for heat in the Correctional Treatment Facility.... The institution has provided some of the residents with extra clothing and blankets, but even so, there is a large percentage of the population who did not receive such.[18] This out of kindness is still not enough to protect us from such frigid temperatures.... In this facility, the Department of Corrections houses residents of all [kinds]. There are pregnant females, diabetics, HIV patients, high and low blood pressure patients, etc. Therefore, these people, as well as those who are not categorized above, need to protect themselves from the cold. Some nights it gets so cold until I can't sleep.... I have heard many different stories regarding the heat situation ... but the main thing is that we need heat in this building.

(Pls.Ex. 160 at DC0003826–27.) Jane Doe K received no response from the DCDC. (R. 6–119.)

Mr. Ward Duel, the Plaintiffs' expert in the field of environmental health, visited CTF in February 1994 on a mild February day and took temperature readings in the living areas. (R. 6–54.) Within the same unit some cells were 64 degrees and other cells were 75 degrees. (Pls.Ex. 638 at 7.) Mr. Duel found that the temperature of the air blowing out of a register was 65 degrees. (Pls.Ex. 638 at 8.) Residents use paper products, such as toilet paper and sanitary napkins, to cover air vents which are blowing cold air. (Pls.Ex. 147 DC0003401, DC0003412, DC0003444, DC0003440.)

The malfunction of the ventilating system creates noise. (Pls.Ex. 638 at 9–10.) From the ventilation noise alone, Mr. Duel received a decibel reading of 74 decibels and in an empty cell during the morning with the door shut he got a reading of 44 decibels. (Pls.Ex. 638 at 9.) He stated that the maximum allowable decibel level for nighttime conditions is 45. (R. 6–57.)

Mr. David White, Chief of Facilities Maintenance at CTF, is uncertain that the recent efforts to repair the system will solve the problems with heat at CTF. (R. 6–68; 12–75.)

Beyond the heating problem, there are many other unsanitary conditions at CTF. There are defective toilets which result in the exposure of sewage and possible environmental transmission of sewage-born illnesses. (Pls.Ex. 638 at 6.) Water leaks out of some showers damaging ceilings below and injuring prisoners. (R. 6–62; Pls.Ex. 638 at 6–7; Pls.Ex. 159 at DC0003820.) CTF staff do not use cart liners to transport the laundry thus promoting the spread of germs. (Pls.Ex. 638 at 12; R. 6–58; 12–5.) Women inmates are responsible for cleaning their cells, yet the institution does not provide them with adequate supplies because of an internal distribution problem and an uneven delivery by the supplier. (R. 4–91; 6–62 to 63.) CTF has a problem with rodents. In a September 20, 1993 letter to Captain L.C. Jones, then Assistant Administrator for Operations, Ms. G.H. Washington, Associate Director of Programs, stated that "[t]here is excessive mice dropping, mice nesting debris and trash on the floor, on the shelves, and behind the shelves." (Pls.Ex. 146 at DC0003390.) Mr. Duel found that CTF had a significant problem with mice in the corridors, hallways, stairways and kitchen. (Pls.Ex. 638 at 15.)

Inadequate food preparation threatens residents at CTF. (R. 6–63 to 65.) Mr. Duel found special diet meals[19] which were 30 to 40 degrees below an acceptable level. (R. 6–64.) The sanitarian's Food Establishment Self–Evaluation Reports, (Pls.Ex. 183), are similar to the evaluations used by the D.C. Department of Consumer and Regulatory Affairs (DCRA) when they examine commercial food establishments. Out of 41 Food Establishment Self–Evaluation Reports for the CTF main and satellite kitchens, 34 fell below the "acceptable" level. (Pls.Ex. 183.)

---

18. The evidence indicates that many women do not receive an adequate amount of blankets or clothing when the heating unit malfunctions. (R. 3–18, 4–89, 6–117 to 119.)

19. These meals are prepared for people with certain medical needs and for people who wish to comply with certain religious obligations. (R. 6–63 to 64.)

The Defendants recently hired a nutritionist who has improved the quality of the special diets but it is not clear whether she has been hired for long-term employment. (R. 6–71, 75.)

The water temperature in the lavatory hot water faucets ranged from the high 80's to the low 90's. (Pls.Ex. 638 at 6.) When the Administration uses disposable utensils, trays and plates during breakfast, the mid-morning water is borderline acceptable. (R. 6–69.) The use of disposable goods, however, creates a waste removal burden. (R. 12–8.)

### b. The Annex

Though the Defendants intended to send all female prisoners to CTF in 1992, "population pressures" forced the Defendants to use the Annex to house short-term female prisoners. (Pls.Ex. 334 at DC0018932.) One factor in this decision is contained in a June 1, 1992 Memorandum to Director Ridley, in which Administrator Krull observes that by "[c]onfining the population to short-term offenders, the risk of a law suit is diminished." (Pls.Ex. 334 at DC0018935.) Despite this type of strategic thinking, the Defendants' official policy states: "It is the policy of the DCDC to provide a safe environment for all staff and inmates in its institutions and facilities through compliance with American Correctional Association (ACA) standards and other applicable regulations and statutes." (Pls.Ex. 143.)

The Annex was constructed in 1955 and served as the Department's Training Academy until August 1988 when it was converted to a minimum security facility for male prisoners. In September 1989, it was converted again for use by women prisoners. The Annex is composed of dormitories which are converted military barracks. (Pls.Ex. 637 at 4.) Dormitory 6 is a large open room with a rest room and small day room combination opening off one end. (Pls.Ex. 637 at 4; R. 6–10.) Dormitory 7 is a larger dormitory with smaller sleeping areas on either side that open up into a small, central day room. (Pls.Ex. 637 at 4; R. 6–10..) Attached to the day room is a rest room and showers shared by both wings. (Pls.Ex. 637 at 4.) In Dormitory 6, as of June 1994, there were 80 beds. (R. 6–8, 6–43.) In Dormitory 7A there were 62 beds and in Dormitory 7B there were 32 beds. (R. 6–8, 6–43.) The beds in the dormitories are double bunks the heads of which are placed against the outside wall. (R. 6–8.) Most of the beds in the row are approximately 30 inches apart which means that an inadequate amount of light reaches the lower bunks.[20] (R. 6–8; 11–142; Pls.Ex. 637 at 14.) The lack of light is an obstacle to floor cleaning. (Pls.Ex. 637 at 14; R. 6–19 to 20.)

On July 26, 1993, Ms. Regina Gilmore,[21] Acting Chief of Female Offender Programs, sent a letter to Ms. G.H. Washington. In the letter, Ms. Gilmore provided a summary of conditions at the Annex:

> These buildings were not initially designed for continued residency and in 1989 emergency renovations were made to accommodate housing of female residents. In July 1992, the population dramatically decreased when CTF opened and upkeep suffered. In late 1992, the population quickly swelled as female offenders were returned from federal facilities and the Detention Facility transferred more women to manage crowding. There is an average of one hundred and seventy (170) females housed in these two dorms. Renovations and preventive maintenance have not kept pace and repair needs have reached crisis proportions.

(Pls.Ex. 170 at DC0003870.)

The environmental health experts of the Plaintiffs and the Defendants believe that the population in the dormitories is "excessive."[22] (R. 6–10, 11–140.) The overcrowding at the Annex creates a shortage of sani-

---

20. The light on the lower bunks ranges from less than five-foot candles to ten-foot candles. (Pls.Ex. 637 at 14.) The American Public Health standard is 30–foot candles and the ACA standard is 20–foot candles. (Pls.Ex. 637 at 14.)

21. Ms. Gilmore is presently the Coordinator of the Female Offenders Program for the DCDC.

22. Defendants' environmental health expert, Mr. Peter Genco, believes that the Annex population must be reduced by 50 percent. (R. 11–140.)

tary facilities,[23] (Pls.Ex. 637 at 9–10.), increases the spread of infectious disease, (R. 6–11.), produces a heightened noise level,[24] (Pls.Ex. 637 at 8.) and creates filthy living conditions, such as dirty floors and moldy bathrooms. (R. 4–119; 4–150.) Jane Doe XI stated, "I was housed . . . for a long period of time [at] Alderson, West Virginia [which] is the oldest federal women's facility there is and . . . you can't even compare it to [the Annex]. . . ." (R. 4–150.)

There is no mechanical ventilation in the dormitories except for the window air conditioners. (Pls.Ex. 637 at 12–13.) This results in a level of carbon dioxide which far exceeds military standards. (R. 6–11 to 6–15.) The poor quality of air promotes eye and throat irritation and the transmission of respiratory illnesses. (R. 6–15.)

The Annex also has a "very significant level of roaches." (Pls.Ex. 637 at 11–12; R. 6–22.) As Jane Doe VII testified: "They're in the room, in your bunk. . . . If you look behind your bunk right in the crease, . . . you'll see roaches hibernating back there. . . . Sometimes if you look over next to you you'll see roaches crawling on the person while they sleep." (R. 4–120.) Plaintiffs' environmental health expert witnessed roaches in footlockers and vertical lockers at the Annex. (R. 6–22 to 6–23.) Roaches use the many cracks in Annex walls to hide or drop an egg and are capable of carrying dysentery, salmonella and infectious hepatitis. (R. 6–22 to 6–24.)

Mr. Duel found torn mattresses and pillows which provide a haven for bedbugs, lice and ectoparasites. (Pls.Ex. 637 R 10–11; R. 6–24 to 6–25.) Torn mattresses cannot be cleaned effectively, thereby increasing the likelihood that previous users will transmit skin diseases to the next person who sleeps on the mattress. (R. 6–25.) Defendants also place clean and dirty laundry in the same cart without any liner. (Pls.Ex. 637 at 16; R. 6–49 to 6–50, 11–139.) Germs from the dirty laundry stay in the cart to contaminate the clean laundry that reenters the cart. (R. 6–49 to 50.)

The kitchen facilities are unsanitary. (Pls.Ex. 637 at 18–20.) Despite Defendants' efforts to clean prior to inspection, Mr. Duel found dirt in less obvious places. (R. 6–32.) A review of maintenance records revealed that the kitchen drains were frequently clogged. (R. 6–33.) All of the these unsanitary conditions in the kitchen provide a source of food borne illnesses. (R. 6–33.) In addition, the dumpsters attract vermin because they are left open and contain unbagged material from the cafeteria. (R. 6–28 to 29, 11–142.)

Monthly inspection reports performed by the Defendants' Environmental Safety and Sanitation Office indicate that there is very little preventive maintenance at the Annex. (Pls.Ex. 144.) The heating unit which is designed to provide heat and hot water to the Annex frequently malfunctions, resulting in lukewarm water all year around. (R. 4–120; 6–26; Pls.Ex. 170 DC0003871.) The grounds of the Annex drain poorly which results in dangerous accumulations of ice in the winter, mud in the day rooms and breeding grounds for mosquitos in summer. (R. 6–27 to 6–28; Pls.Ex. 486; Smith Dep. at 87–88; Gilmore Dep. at 108, 127.) In fact, mosquitos and flies are in the dining room, the food preparation area and the dish washing area of the kitchen. (R. 6–46, 11–144.) These mosquitos transmit illness-causing organisms. (R. 6–46.)

The record indicates a willingness on the part of women prisoners to improve the living conditions at the Annex. In a letter to Ms. G.H. Washington, dated June 26, 1993 Jane Doe XI stated:

> In all of these years of doing my sentence I have never seen such run-down nor de-

---

**23.** The ACA standard requires 1 lavatory for every 12 inmates and a shower for every 8 inmates. (Pls.Ex. 637 at 9.) In February 1994, Dormitory 6 had a ratio of 13 inmates per toilet, 12 inmates per sink and 12 inmates per shower. (R. 6–15.) In Dormitory 7 there was a ratio of 16 inmates per toilet, 19 inmates per sink and 16 inmates per shower. (R. 6–15.)

**24.** The noise in the day room of Dormitory 7 registered at 74 decibels. (Pls.Ex. 637 at 8.) The ACA standard of acceptability for daytime noise is below 70. (R. 6–17.)

plorable conditions for living quarters.... I do not believe that you are truly aware of this.... There are much needed repairs that need to be done here. Also the upkeep is not truly being maintained for the Women's Dorms. A lot of us Federal Women are applicable and trained in all areas. We can paint, do carpentry and other jobs. Several of us have offered to do the painting of the Dorm I'm living in, if only the paint and materials would be purchased. Repeatedly nothing is done.

(Pls.Ex. 177.)

Outside of the Annex grounds, in the area of prison industries, women prisoners have a history of enduring unhealthy working environment. The Defendants have given potentially hazardous food to women who must eat in unsanitary conditions. (Pls.Ex. 637 at 18; R. 6–35.) The Defendants now provide women with thermal trays, a special delivery truck which keeps the food warmer, and two microwave ovens in the garment shop. (R. 6–46 to 6–47, 11–145–46, Gibbons Dep. at 117.)

Though approximately 25 women used to share one small bathroom at the garment shop, the Defendants now provide the male prisoners with a single bathroom and give the women prisoners four bathrooms. (R. 4–140 to 141; 11–136; Pls.Ex. 362.)

The printing and garment shops do not have an adequate ventilation system which is capable of diluting and eliminating airborne contaminants. (R. 6–34; Pls.Ex. 637 at 13;) Instead there are fans near the ceiling on one side which blow air into the building while on the other side there are fans to blow air out of the building. (R. 6–33 to 6–34.)

Though the evidence undoubtedly demonstrates some attempts to improve conditions at the Annex and the industries, numerous Daily Work Sheets of Facilities Management and Facilities Engineering Service Orders show accelerated activity in the month before the site visit of the Plaintiffs' environmental health expert, Mr. Duel. (Pls.Ex. 480 DC0033257–DC0033300.) Since the Febru-

ary 1994 inspection by Mr. Duel, the Defendants have repaired the roof where it leaked onto the electrical box. (R. 6–44.) A dirty ceiling in the kitchen had been replaced and lighting for the walk-in coolers had been added. (R. 6–45.)

## 2. Fire Safety

The three crucial elements of fire safety are the building, the systems within the building, and the building's operations. (R. 7–7.) The operational aspect of a correctional facility is distinct from an ordinary building because inmates need the assistance of third parties (correctional staff) to exit a building. (R. 7–23.) It is, therefore, crucially important to educate and drill staff in the removal of people from the building in an emergency.

### a. CTF

The buildings of CTF are made of noncombustible materials, with fairly low combustible loading inside. (R. 7–39.) The facility has a full sprinkler system and a full fire alarm system. (R. 7–39.) It has a detection system in the corridors and common areas. (R. 7–39 to 7–40.) Though the fire alarm system is tested quarterly, (R. 13–23.), the sprinkler system is not being adequately maintained and tested. (R. 7–40 to 41; 13–24 and 63.) The sprinkler system, however, should be tested quarterly. (R. 13–63.) There is maintenance of the fire pump[25] but no testing. (R. 7–41.) All nationally recognized standards require annual testing of a fire pump. (R. 7–41.)

There is water leakage occurring in the building, especially in the basement and the culinary area where electrical conduit and electrical equipment are exposed. (R. 7–39.) The staff stores more in culinary spaces than the sprinkler system can handle. (R. 7–44 to 7–45.)

In the area of fire drills, approximately ten staff members and four inmates told Mr. Thomas W. Jaeger, the Plaintiffs' expert in the field of fire safety, that a year will pass without a fire drill. (R. 7–44.) Dr. Eliza J.

---

**25.** The fire pump provides the thrust that the water needs to reach the sprinkler units at the upper levels of the building. (R. 7–41.)

Taylor, Acting Chief Medical Officer at CTF, informed Dr. William Hall on July 30, 1993: "Have requested a fire drill for levels 68 and 82. Staff really needs to go [through] a mock evacuation drill." (Pls.Ex. 394 at DC0025075.) On September 1, 1993, she wrote that "Sgt. Bonapart, Safety and Fire, had been approached on several occasions regarding mock evacuation drill—especially egress from . . . [the] Infirmary. There has to be a concerted effort on the part of the medical staff and security to coordinate the evacuation procedure because of the difficulty with movement in this facility." (Pls.Ex. 394 at DC0025059.)

### b. The Annex

The level of fire safety at the Lorton Annex is grossly inadequate and below any nationally recognized standard. (R. 7–5.) It is not even in compliance with the District of Columbia standards. (R. 7–27.) The two Annex dormitories are of ordinary construction, which means that the Annex has masonry floors, masonry walls and wood roofs, wood paneling and planking as interior finish within the building. (R. 7–7 to 7–8.)

The combustible load at the Annex is heavy because 174 people with personal items, such as beds and pillows, live in a relatively small area. (R. 7–8.) Some inmates have lockers, but there are a significant amount of personal items stored in cardboard boxes and plastic bags near bunks which contributes to a hazardous continuity of the combustible load.[26] (R. 7–9; Pls.Ex. 398.) The use of metal storage lockers would significantly decrease the continuity of the load. (R. 7–9.)

Each dormitory possesses a storage room with a high load and one dormitory has a storage locker. (R. 7–9) Inside this area are cleaning materials, a large supply of paper towels, toilet paper and a large amount of combustible material. (R. 7–9.)

A fire would spread from one end of a dormitory to the other end in approximately five minutes. (R. 7–10.) There is also the danger of "flashover," which means that all the combustibles could be heated to the point of ignition when exposed to enough oxygen. (R. 7–11.)

The only compartmentalization[27] at the Annex is the separation of the boiler room from the dormitory. (R. 7–11 to 7–12.) Nothing exists to contain a fire within the T.V. room, the sleeping area, the bathroom, the storage area or offices. (R. 7–12.)

The two dormitories have several exits for use in an emergency. (R. 7–12 to 7–14.) Dormitory 6 has three exits which include the main door and doors at the far end and by the T.V. room. (R. 12–127.) Dormitory 7 has three exits in addition to its main door. (R. 12–128.) The main doors are unlocked 24 hours a day and the other doors are locked between 11:00 p.m. and 7:00 a.m.[28] (R. 12–127.) Although the Annex has windows, there is not a nationally recognized standard that recognizes a window as an exit except in a single-family home. (R. 7–14.)

The amount of exits and their capacity are adequate for the number of people living in the Annex, but Mr. Jaeger testified that there must always be exits in two directions because a fire could block access to a single exit. (R. 7–13; 7–21.)

The fact that the dormitories are single-story structures does not eliminate the danger to residents. (R. 7–29 to 30.) Multiple death fires still occur in single-story buildings. (R. 7–30 to 7–31.) In 1982, 29 people died in a fire that occurred in a one-story, fire-resistant building in Biloxi, Mississippi. (R. 7–31.)

At this time, the Defendants do not have an adequate fire alarm system at the Annex. The fire alarm apparatus at the Annex is antiquated. (R. 7–15.) The dormitories

---

26. This measurement reflects the ability of a fire to spread from one piece of combustible material to another. (R. 7–8.)

27. Compartmentalization is a construction design which places fire-rated doors or smoke-tight doors around an area so that a fire remains contained in that space. (R. 7–11.)

28. When Plaintiffs' fire safety expert, Mr. Jaeger, performed his tour of the Annex, he was told that the exits are locked. (R. 7–13.) Since that time he has been told that one exit in the center of each building remains unlocked while the exits at each end are locked. (R. 7–13.)

have a pull station and a bell to notify residents in the event of a fire. (R. 7–15.) There is no control panel, no system supervision and no distribution of bells throughout the building. (R. 7–15.) The bell rings only within the dormitory itself. (R. 7–15.) The sleeping areas of the dormitories have smoke detectors which alert only those within the area of the detector. (R. 7–16.) There is no control panel to provide emergency power or to send a signal outside the buildings to a central control center or to send a warning that the system is not operational. (R. 7–16.)

The only "realistic" fire suppression system to use at the Annex would be a sprinkler system. (R. 7–18 to 7–19.) The dormitories only have 2½ gallon fire extinguishers. (R. 7–19.) These cannot serve as a large component of fire suppression since they are only designed for small fires and people usually do not know how to operate them. (R. 7–19.)

The Defendants' policy at Minimum for fire protection outlines a plan for fire prevention, fire suppression, and evacuation. (Pls.Ex. 400.) It requires "fire inspections and testing of equipment by [a] Fire Safety Officer at least once each quarter ... [and a]n annual inspection by [the] Fire Prevention Section, Lorton Volunteer Fire Department or other qualified Fire Inspector(s)...." (Pls.Ex. 400 at 1.) Though the plan calls for quarterly drills, there is no evidence of staff training or the actual occurrence or success of drills. (R. 7–22.) The plan also does not state whether "quarterly" intervals refers to four times per year per shift, or four times per year per site, or four times per year per building. (R. 7–23.) The national standard calls for four drills per shift per year so that every shift is prepared. (R. 7–23) Some of the Annex staff told Mr. Jaeger that they had not performed any drills, while others recalled that their last drill happened four or five months earlier. (R. 7–25.)

On the issue of planning, Mr. Jaeger's testified: "I asked the correctional officer in Dorm 6 for their fire evacuation plan for the dormitory, and what I was handed was post orders, and the post orders don't refer one word to fire safety. There's a separate fire evacuation plan. That correctional officer did not understand the difference between their post orders and their fire evacuation plans." (R. 7–25 to 7–26.)

The Defendants have known about the hazardous conditions at the Annex for a long time. On January 24, 1994, Corporal Pleasant of Minimum informed Ms. Barbara A. Hart, the Acting Assistant Administrator for Operations, about certain deficiencies at the facility relating to fire safety. (Pls.Ex. 403.) He concluded his letter by stating: "Based upon my direct observation, the severity of the deficiencies in most instances would indicate they should be made top priority, but, they're merely ignored." (Pls.Ex. 403 at DC0025594.)

Pursuant to a request by Mr. Douglas W. Stempson, the Administrator at Minimum, Systems Engineering, Inc.[29] conducted an inspection of Minimum and concluded that it "constitute[s] an immediate life threatening situation. The problem has been exacerbated by the over-crowding condition of the Minimum Security Facility. There are hundreds of inmates and staff at the Minimum Security Facility, and there is no means of fire detection or evacuation." [30] (Pls.Ex. 532 at DC0035801.) The report also rated the fire alarm system in the Administration Building, the gymnasium and the cafeteria as "very poor" because the fire alarm panels are not operational, the voice evacuation systems have been removed, the smoke detectors are filthy or painted, and the manual stations are broken or inoperable. (Pls.Ex. 532 at DC0035801.) All of this is the result of Defendants' neglect and improper operation. (Pls.Ex. 525 at DC0035587.) Mr. Stempson and Ronald Jenkins, the D.C.D.C. Fire Marshal selected the proposal of Systems Engineering, Inc. to install a new fire alarm system. (Pls.Ex. 525 at DC0035587.)

On April 8, 1994, Mr. Stempson requested funding for a fire alarm system and stated,

---

**29.** This company specializes in fire alarm system design, development, testing, maintenance and repair.

**30.** Mr. Jaeger agreed that there are no provisions for fire detection but there are provisions for evacuation.

"The lack of a working, compliant fire alarm system creates hazardous living and working conditions at the institution . . . The investment in a new fire alarm system is likely to be much less than the liability resulting from a lawsuit." (Pls.Ex. 525 at DC0035586.)

Mr. Quander, the Executive Deputy Director for the DCDC, responded to Mr. Stempson by speaking with the associate directors and requesting another survey to see if in fact the SEI report was accurate and to determine if funds were available to correct the problem if it existed. (R. 8–47.) Mr. Quander, however, testified that he had no knowledge as to who is responsible for the survey and when it will be complete. (R. 8–58.)

### D. Programs

The term "programs" encompasses: 1) educational programs which include academic, college and vocational, 2) work programs which would include work details, industries and work training, 3) recreational programs and 4) religious programs. (R. 5–6.)

The issue of programs must be viewed with an eye toward the general characteristics of an inmate population. In 1992, the demography of women prisoners in D.C. was as follows: 97 percent were African–American; 82 percent were single-parent primary caretakers; 85 percent were unemployed; 42 percent had a twelfth-grade education, and 7 percent were serving sentences for a violent crime. (Pls.Ex. 289 at DC0018269.)

Though women prisoners have access to programming within the D.C. correctional system, women prisoners many times do not receive reception and diagnostic (R & D) studies to determine their programming needs and interests. (Pls.Ex. 281 at DC0018045–46.) This is not the case with male prisoners. (Gibbons Dep. at 62–63.)

A report from the Female Offender Programs Office detailed the Defendant's overall failure to provide adequate programming for women prisoners. The report points to several reasons for the failure but concluded: "[O]f paramount influence is the Department's sudden housing of 99.5 percent of all female D.C.Code offenders without having planned, developed and implemented either programs or resources to meet the long-term treatment needs of this unique population." (Pls.Ex. 281 at DC0018044.) Mr. Plaut and Mr. Quander concede that when the women returned to CTF from the federal system not all programs were in place. (R. 8–19, 8–106.)

In addition to obvious intellectual and financial benefits, the completion of academic, vocational, apprenticeship and higher education programs qualifies women prisoners for good time credits (Pls.Ex. 272 at DC0017648–57.) and an increased industrial wage. (R. 10A–48 (Morning Session).)

On the subject of work opportunities, Ms. Jennie Lancaster, the Plaintiffs' expert penologist, testified:

> One of the questions that I also asked during my interviews was what, in the employees' opinion . . . caused women to come back to prison in the District. . . . And what I heard over and over is lack of money to take care of themselves, to take care of their children, inability to have a job. . . .

(R. 5–41.)

### 1. The Annex

The Court will analyze the quality of programs offered to women prisoners by comparing the minimum custody women at the Annex to similarly situated males at the Minimum Facility (Minimum). The population at Minimum as of January 1994 was 1,103 prisoners; 167 of whom were women.[31] (Pls.Ex. 520 at DC0030884 & DC003092.)

### (a) Academic and College Education

Whereas the men at Minimum receive full time Adult Basic Education (ABE) and General Education Development (GED) classes (R. 5–19.), the women at the Annex have one teacher, Ms. Gray, who provides the residents a three-hour ABE class and a three-hour GED class. (R. 5–18.)

Sometimes the classes do not meet. The Defendants closed the school when the D.C. Government planned to move all women prisoners from Minimum to CTF. (R. 5–19.) In

---

**31.** Mr. Plaut testified that the current population is 174. (R. 8–99.)

the summer of 1993, the air conditioning system in the classroom broke, forcing the closure of the school. (R. 4–103.) On another occasion, Ms. Gray broke her leg and missed approximately three months of work. (R. 4–102.) Though Ms. Hazel Smith, then Acting Correctional Program Officer,[32] asked Mr. Stempson for a replacement, no substitute was sent. (Smith Dep. at 105.)

Dr. Ryan, the Defendants' expert penologist, described the basic education offered at the Annex as "minimally adequate." (R. 11–65.) In her tour of the Annex she found women prisoners who would pursue this course of study if another teacher was available. (R. 11–66.) For this reason, Dr. Ryan recommends that the Annex hire a new teacher. (R. 11–66.)

The college education at Minimum and the Annex is two pre-college classes and two electives each semester which meet at the main compound. (R. 5–20.) The women rely on escorts who routinely take them to class late. (R. 4–100 to 4–101.)

### b) Vocational Education

Vocational programming usually has two components: on-the-job training and a related classroom curriculum. (R. 5–22.) The Annex offers one vocational program to women. This is the Graphic Arts program which is held at Central and lasts 15 weeks. (R. 5–27 to 28.) It would, however, take a year in that program to gain real skills in order to get a job in that industry. (R. 5–28.)

The men at Minimum, as well as women, receive the Employment Training and Awareness Technique Program (ETAP). (Pls.Ex. 674 at 1.)

The limited sentences served by minimum custody prisoners present difficulties for a prisoner since an adequate vocational program usually lasts one to two years. (R. 11–70.)

### c) Work Details

The Annex provides residents with work details which are support duties needed for the running of the jail. (R. 5–29) They include maintenance, housekeeping, receptionist, library work, and office clerk. (R. 5–32; Pls.Ex. 379.) They do not perform the more skilled maintenance duties (eg. carpentry, plumbing.) at the Annex. (R. 5–33.)

The male inmates at Minimum have over 30 separate work details. Some of the details are carpentry, dairy, mechanics, painting, plumbing and welding. (R. 5–32 to 33; Pls.Ex. 379.) Some men leave the facility to work on a farm. (R. 5–33.) With the exception of Greensweep and a position at a halfway house, women are confined to the Annex. (R. 5–33.)

### d) Industries

A prison industry is a business run out of a prison where goods are produced with inmate labor and then sold to government agencies. (R. 10A–46 (Morning Session).) Prison industries usually offer the highest wage and the most valuable job skills. (R. 5–34.) The pay scale ranges from approximately $80 a month to $300 a month. (Pls.Ex. 225 at DC0008487.) Those working under staff supervision can make up to $1.99 an hour and unsupervised prisoners can earn up to $2.63 an hour. (R. 10A–48 (Morning Session).)

Presently 65 out of the 604 prisoners who participate in industries are women. (R. 10A–48 to 9 (Morning Session).) Women at the Annex participate in the garment shop (50 women) and print shop (2 women) at Central. Men at Minimum may participate in the industries of agriculture and landscape. (Pls.Ex. 674 at 2.) Dr. Wilbert Brown Jr., Assistant Director for Industries, stated that women may not participate in any of the other industries at Central "primarily because of security availability. That is primarily a security accommodation kind of issue because we don't have adequate restrooms...." (R. 10A–50 (Morning Session).) Mr. Brown also testified that the furniture repair shop, the metal fabrication shop and laundry facility do not provide room to adequately view the prisoners. (R. 10A–50 to 51 (Morning Session).) The agricultural program takes place over 460 acres and would be difficult to supervise. (R. 10A–51 to 52 (Morning Session).)

---

**32.** Ms. Smith is presently the Assistant Warden at the Annex.

### e) Work Training

Work training is a program which allows inmates to work in the community at regular wages. (R. 5–37.) Mr. William Plaut, the Deputy Director of Operations and the Acting Deputy Director of Programs stated, "the primary mission of the Minimum Security Facility is a work institution, ... it's the institution in the Department whereby inmates, both male and female, can participate in work training programs...." (R. 8–97.)

The policy at Minimum is that a woman prisoner must reside at the facility for 90 days and be one year short of release before she is eligible for work training. (R. 4–144, 5–38.) Then, the women undergo a psychological evaluation. (R. 5–38.) The next step is the four-week ETAP program which is pre-vocational. (R. 5–38 to 39.) Afterward, the case managers must complete paperwork which is usually accomplished in four to eight weeks. (R. 5–39.) Mr. Derr, the vocation development specialist, believes that there are eligible women who cannot participate simply because they do not have paperwork done. He said, "Normally, nine times out of ten the ones who come from CTF are almost eligible...." (Derr I Dep. at 116.)

The women's participation in work training is "token." (R. 5–37.) In 1992, 2 women participated and the following year 3 women took part. (R. 5–37.) Dr. Ryan found on her tour that 4 women participated in work training. (R. 11–71.) Jane Doe XI said that more women do not participate in work training because, "[Y]ou don't ever hear [or read] anything about work training at Minimum Women's Annex unless one of the ladies that had been on work training happens to discuss it with you." (R. 4–148.)

Jane Doe XI had difficulty with this program because Mr. Derr was so busy with other duties that he did not have the time to take women prisoners on job interviews. (R. 4–146 to 147.) Mr. Derr does not have sufficient transportation either. (R. 4–146; Derr I Dep. at 131.)

The average number of men is usually 55 to 60. (R. 5–37 to 5–38.) They work in construction, as truck drivers, and as day laborers. (R. 5–38.) The Administration explains the disparity by citing the varying sentence structures of the men and women. (R. 5–38.)

### f) Recreation

The Annex has a recreation trailer which contains a pool table, a ping pong table, exercise bikes and a weight machine. (R. 5–46; Pls.Ex. 27 at DC0000314.) The trailer is scheduled to be open approximately two hours on Sunday, Tuesday and Thursday; three hours on Saturday, and four hours on Monday, Wednesday and Friday. (Pls.Ex. 27 at DC0000313.) The trailer is closed on Sunday, Tuesday and Thursday during visitation hours. (Pls.Ex. 27 at DC0000313.) A staff member, usually Recreation Specialist Hargrove, must open it. (R. 5–46.)

There are no outdoor recreation facilities at the Annex. (R. 5–46.) Ms. Hargrove, therefore, escorts the women as a group to the recreation areas at the Minimum Facility main compound twice a week for three hours. (R. 5–46.) They can participate in volleyball, basketball, handball, ROTC and talent shows. (Pls.Ex. 27 at DC0000314.) Sometimes outside guests perform at events like Gospel shows, fashion shows, and variety shows. (Pls.Ex. 27 at DC0000314.) But Jane Doe VII said that "if the men are having a ... basketball game or volley ball game then they take away our rec time so they can have their games." (R. 4–107.)

The men at Minimum have access to the gymnasium and the ball field for approximately 6 hours in the morning Monday through Friday, and approximately 3 hours on several nights each week, and to the weight trailer 7 days a week during their free time. (Pls.Ex. 498). They may participate in organized intramural team sports. (R. 5–47.) The men may also participate in the Renaissance Drama Class.[33] (R. 4–108.) The women prisoners may not participate in Renaissance and have no equivalent drama program. (R. 4–111, 115; Pls.Ex. 626.)

---

**33.** Renaissance is a drama troupe that performs for children in churches, juvenile detention facilities and recreation centers. (Pls.Ex. 627.)

### g) Religious Programs

In the area of religious programs, Ms. Lancaster stated, "In my experience religious programming promptly draws the greatest number of female inmates than any other program that's routinely offered." (R. 5–51.) The women have Catholic and Protestant services on a weekly basis and a Bible Study Program. (R. 5–50.) A chaplain goes to Minimum three times a week, but the hours are not scheduled and he has no office there. (R. 5–50.) The Defendants have difficulty satisfying the demand for Islamic services because of an inability to acquire volunteers to conduct those services. (R. 9–98 to 99.)

There is no chapel at the Annex (R. 4–118.) so women hold religious services in the visiting hall. (R. 4–117.) Jane Doe VII stated: "During church service if the visitors have to use the bathroom then they'll come ... through the service, and when it's time for the visitors to leave, the females have to get [strip searched]." (R. 4–118.)

The men at Minimum have two Protestant services, Catholic services, Muslim services and four volunteer programs. (R. 5–51 to 52.) A chapel is also located on the grounds and a chaplain is assigned to Minimum. (R. 5–52.)

### 2. CTF

The Court will analyze the quality of programs offered to women prisoners by comparing medium custody general population women at CTF to the similarly situated men who reside at Occoquan Facility (Occoquan), Central Facility (Central), and the Medium Facility (Medium). As of January 1994 the population in each of those facilities was: 1,373 prisoners at Central, 1,016 at Medium and 1,767 at Occoquan, (Pls.Ex. 520 at DC0030883–85), and 271 women prisoners at CTF (Pls.Ex. 520 at DC0030902.)

### a) Academic and College Education

Academic programs are available to women at CTF. The women have ABE class and GED class for approximately 3 hours a day. (R. 5–11 to 12.) These classes are scheduled at the same time as the vocational classes which means that if a woman wants to take both she can take only 1½ hours of each. (R. 9–83 to 84.) The men at Central have an 8–hour ABE class and an 8–hour GED class. (Gibbons Dep. at 61.) At Medium and Occoquan, there are 5½ hour ABE classes and 5½ hour GED classes. (R. 5–12.)

CTF offers college education to women, as well. Presently, Atlantic Union College (AUC) offers a computer-based AA degree program in general studies at the facility for 2½ hours in the morning, 3 days a week. (R. 5–15 to 16.) Residents may apply for a Pell Grant to cover tuition. (R. 5–15.) The credits that they earn with Atlantic are transferable to the University of the District of Columbia. (R. 11–62.) The Defendants expert penologist, testified that the Defendants should offer women prisoners at CTF a four-year program through an accredited university that ensures transferable credits. (R. 11–64 to 11–65.)

Mr. Walter Woodard, the GED teacher, helps women complete their Pell Grant forms; he passes out new books and he tries to correct computer problems. (R. 3–4.) The residents help each other with the classwork and then send it via computer to their AUC teacher in Lancaster, Massachusetts. (R. 3–5.) Women, however, have problems getting class materials (R. 3–5.) and problems delivering their homework in a timely manner long distance. (R. 3–6.) Currently women prisoners can only receive this class three days a week because male prisoners at CTF use the law library two days a week. (R. 3–6.)

Central, Medium and Occoquan offer more extensive college education. Central offers a UDC program which furnishes a B.A. degree, an A.A. degree and precollege courses. (R. 5–16.) Medium offers the Park College program which is offered 6 hours a day and provides a B.A. degree, a B.S. degree and an A.A. degree. (R. 5–16.) Occoquan gives residents a UDC program which offers an A.A. degree, a B.A. degree and the Park College program which offers a B.A. degree and an A.A. degree. (R. 5–16.) The District of Columbia funds the UDC programs while residents must receive a Pell Grant for the Park College program. (R. 5–16.)

Though CTF runs a primarily decentralized unit-management system, education programs are centralized. (R. 11–32.) Since CTF is a controlled-movement facility, it is critical that the elevator and the escort service function effectively. (R. 11–101 to 11–102.) Women are taken to elevators which carry them to another floor where a staff member escorts them to the class area. Due to problems with the escort system at CTF, women often arrive late to class. In the male facilities, the men are simply let out of the dormitories or living areas and allowed to go to class independently.[34]

The need for more staff at CTF is recognized even by Defendants' expert penologist Dr. Ryan. (R. 11–102.) The Administration has dealt with the need for extra staff by using overtime. (McCathorine Dep. at 115–16.) Overtime, however, frequently causes "staff burnout" (R. 5–13.) and is recognized by Mr. Quander as not being a long term solution. (R. 8–29.)

Defendants have hired approximately 70 new officers and have the authority to hire an additional 130. (R. 8–27 to 28.) It is unclear how many of these guards will work with women prisoners at CTF. Defendants also claim that the problem with escorts has been corrected by using school passes and designating an elevator operator specifically for women prisoners who are students. (R. 9–119 to 120.)

#### b) Vocational Education

Graphic Arts is the primary vocational program offered to women at CTF. (R. 5–22.) It is associated with the Docutech Program Lab and there are thirteen women participating in the program right now. (R. 9–33.) It meets five days a week for two and one-half hours in the morning and approximately two hours in the afternoon. Only minimum custody women can join. (Pls.Ex. 306 at DC0018562–63.) The Youth Act women who reside at CTF are required by a consent decree to be in vocational training and fill 2

of the spots. (Pls.Ex. 294 at DC0018420–21; R. 9–33.)

CTF also offers programs in computer literacy, sewing and typing. (Pls.Ex. 306 at DC0018564.) A prerequisite for the computer literacy program is an eighth-grade achievement level. (R. 5–23.) While these are listed as vocational programs, they do not have a classroom component. (R. 5–24.) Furthermore, there have been problems with teachers not appearing for class. (R. 5–23.) Dr. Ryan believes that the Defendants should offer at least one more program. (R. 11–96.)

The men's facilities offer an abundance of vocational opportunities and apprenticeships. (Pls.Ex. 517.) Central offers 15 different programs: Auto Body, Auto Mechanics, Barber Science, Brickmasonry, Building Maintenance, Business Typing, Carpentry, Culinary Arts, Digital Electronics, Drywall, Electricity, Graphic Arts, Landscape, Photography, and Plumbing. (R. 5–24; Pls.Ex. 674.) Medium Facility offers Brickmasonry, Drywall/Painting, and Word Processing. (R. 5–24.) At the Occoquan Facility there is Digital Electronics, Graphic Arts and Photography. (R. 5–25.) All three of the male facilities offer ETAP which is a prevocational course. (R. 5–25.)

Mr. Vincent Gibbons, the Administrator of Central, stated that it would be "an absolute nightmare" if women were escorted to Central to participate in vocational training. (Gibbons Dep. at 92.) Mr. Gibbons claimed that his position rested on "a combination of factors" but only managed to say that "fraternization" would jeopardize prison security. (Gibbons Dep. 93–95.)

On the staff reaction to the presence of women, Mr. Gibbons stated the following:

> [E]arly on, there was a lot of suspicion and a lot of concern about the fact that this was going to pose a major security crisis.... However, that was short lived and everyone has been very, very impressed with how few problems there have been and

---

34. Occoquan is a "controlled movement" facility that houses the most violent medium custody male prisoners. (Braxton Dep. at 16.) The dormitory doors are locked and an inmate must have a pass to traverse one of the three zones

except for meal and recreation time. *Id.* at 22. Men do not need an escort unless they are being disciplined, in protective custody or awaiting bed space. *Id.* at 24.

with the fact that the women are generally pretty amicable. They are easy to get along with, friendly, produce good work, and ... again, I have spoken to the shop foreman on a regular basis.

(Gibbons Dep. at 120–21.)

No apprenticeships are available to women at CTF. (R. 5–25.) At Central there are programs in Carpentry, Culinary Arts, Dental Technology, Electricity, Plumbing and Upholstery. (R. 5–25.)

### c) Work Details

CTF lists the following as work details: maintenance, culinary, clerical assignments, education aides, environmental, intake, landscape, offices, quick copy, rec clerk, religious, supply management, unit. (Pls.Ex. 363.)

Central offers 25 work details which include those found at CTF, but also give men the opportunity to practice trades like plumbing, carpentry, bricklaying, mechanics, painting, welding, air conditioning, and masonry. (R. 5–30; Pls.Ex. 674 at 3.) Medium offers the typical support jobs but again offers some trades in painting, plumbing, and electrical work. (R. 5–30.) Finally, Occoquan offers the standard support jobs but includes barbering, carpentry, electrical work, heating, painting and plumbing. (R. 5–30 to 31.)

The salary which residents command depends on the skill level of the job and demonstrated proficiency. The range is between $6 and $21 a month with the higher salaries reserved for jobs requiring a trade skill. (R. 5–31.)

### d) Industries

At Central there are 10 industries such as Accounting, Furniture Repair, Garment Shop, Print Shop, Upholstery and Metal Shop. (R. 5–35.) Medium offers Furniture Repair and Metro Shop. (Pls.Ex. 674; R. 5–35.) At Occoquan there is a Garment industry. (R. 5–35.)

Though the Defendants referred to plans for an industrial program (R. 8–104.) the only program remotely like an industry is Docu-

tech which as of April 1994 pays some women an industrial rate of pay.[35] (R. 10–A–4.) Defendants' expert penologist Dr. Ryan and the Defendants' Female Offenders Program Coordinator Ms. Regina Gilmore stated that there is no industry at CTF. (R. 11–74; R. 9–28.) Dr. Ryan believes that CTF should create an industry. (R. 11–74.) Single gender shifts are possible if the administration is able to fill the shift with enough workers and if two shifts can be run in a cost effective manner. (R. 11–107.)

### e) Recreation

As in other areas of life at CTF, the physical structure and staffing adversely influence the recreational options for women. The women have to be taken to the recreation area and supervised while the men at the other medium security facilities are not supervised. (R. 5–44.)

The scheduled recreation for women at CTF is one hour a day, five days a week and access to the gymnasium for two hours, three times a week. (R. 5–41; Pls.Ex. 424 at DC0027044.) There is also low-impact aerobics two days a week for an hour each day. (R. 9–121.) Plaintiffs' expert penologist Ms. Lancaster stated, "This recreation time is more like segregation. This is what I am more used to with segregated inmates, ... not for general population inmates." (R. 5–41.) She added, "[T]o have one hour a day of outside time when you haven't done anything wrong and you're not in segregation I think is really unacceptable." (R. 5–42.)

Defendants have recognized these limitations on women from the beginning. In an April 15, 1992 letter to Federal Correctional Programs Division, Mr. Arthur Graves, Associate Director for Operations of DCDC, asked that women who had parole eligibility dates "well beyond the year 2000" not be returned "[s]ince these women will not have the opportunity for extensive outside activities while housed at the CTF ...." (Pls.Ex. 320.)

Mr. Vince Gibbons, the Administrator at Central, said that the men at his facility may

---

**35.** Four positions are at the non-industrial rate of $9.25 a month; three women receive full-time industrial pay of $60 a month and the remaining six women work part-time and receive part-time industrial pay. (R. 9–33 to 34.)

go outside between 7:00 a.m. and 10:00 p.m. (Gibbons Dep. at 129–30.) They can play cards, sports, or other outdoor activities. At Medium, according to Mr. Krull, "Men can have recreation all day long." (Krull Dep. at 66.) At Occoquan, men have five hours of open time during the winter and seven hours of recreation a day during daylight saving time. Mr. David Roach, the Administrator at Maximum, said that men at the Maximum Facility generally have 1–to–2 hours of recreation in the morning and 1–to–2 hours in the afternoon. (Roach Dep. at 17.) All of this can be spent outdoors, weather permitting. (Roach Dep. at 18.)

The outdoor recreation programs at CTF occur in a small area which allows for basketball and volleyball. (R. 5–43.) There is a gymnasium and a weight room. The three men's facilities have group sports such as basketball, football, softball, soccer, and volleyball. (R. 5–43.) Central has a track, a handball court, an arts and crafts program and a drama program. (R. 5–43.) Medium also has a track and a handball court. (R. 5–43.) Occoquan has a track, a field, horse shoes, weights, and handball. (R. 5–43.)

### f) Smoking Privileges

Men at the three facilities may smoke outside in designated areas. Smoking is absolutely prohibited within CTF. (Pls.Ex. 249 at DC0009722.) CTF primarily houses prisoners who are receiving treatment for drug addiction and this ban is part of the facility's substance abuse treatment concept. (R. 5–53.)

## III. CONCLUSIONS OF LAW

### A. Claims Under 42 U.S.C. § 1983

■ The elements of a claim under 42 U.S.C. § 1983 are generally satisfied if a plaintiff can demonstrate that a person acting "under color of state law" deprived the plaintiff of a federal right.[36] Municipalities and local government officials sued in their official capacities are considered "persons" under the statute, *Monell v. Department of Social Services,* 436 U.S. 658, 690 & n. 55, 98 S.Ct. 2018, 2035 & n. 55, 56 L.Ed.2d 611 (1978), and action taken pursuant to power conferred by state law and made possible because a person "is clothed with the authority of state law, is action taken 'under color of' state law." *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). The Defendants plainly are persons acting under color of state law within the meaning of § 1983. The dispute in this case centers on whether a federal rights have been violated and whether the Defendants caused the violations to occur.

A municipality is liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). It is also liable for "deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 691, 98 S.Ct. at 2036.

■ The Supreme Court, though generally divided on what constitutes a municipal "policy," has ruled that a municipality is liable for constitutional violations which result from the municipalities failure to train its employees. *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). This may arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at

---

**36.** Section 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

1205.[37]

## B. The Eighth Amendment

Today, there is no serious constitutional argument against the proposition that the conditions within a prison are subject to scrutiny under the Eighth Amendment. The United States Supreme Court has stated:

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment....

*Helling v. McKinney,* —— U.S. ——, ——, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–1006, 103 L.Ed.2d 249 (1989)).

In *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court provided the framework which courts must use when deciding whether certain conditions of confinement constitute cruel and unusual punishment. Plaintiffs in prison conditions cases must satisfy objective and subjective standards before a court can find that a correctional institution has violated the Eighth Amendment.

Under the objective standard, plaintiffs must demonstrate a deprivation which amounts to a wanton and unnecessary infliction of pain. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Though a condition may be harsh, it is a constitutional element of a prisoner's penalty if it is not cruel and unusual relative to contemporary standards of decency. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Since the Constitution "does not mandate comfortable prisons, ... only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The Eighth Amendment does not protect prisoners from inadvertent injury or errors in good faith. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

The combination of some conditions of confinement may constitute an Eighth Amendment violation though each would not do so alone, "but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

A condition which has not caused any present injury may still violate the Eighth Amendment if it "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney,* —— U.S. ——, ——, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). In these situations a Court must then determine whether society considers this risk to

---

party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**37.** In the Defendants' Proposed Conclusions of Law, they submit that the doctrine of official immunity shields them from all claims under 42 U.S.C. § 1983. A claim of immunity, however, is not a bar to prospective injunctive relief against a government official acting in an official capacity. *See Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1980–81, 80 L.Ed.2d 565 (1984). Nor does the claim of immunity bar an award of

attorney's fees. *Id.* at 543–44, 104 S.Ct. at 1981–82. The standard for immunity is whether an official knew or should have known that what they were doing violated the Constitution. Here the relief requested is prospective and a finding by this Court that the Defendants have violated the Constitution provides notice that future such acts or failures to act will violate the Constitution. There can be no good faith. *See Harlow v. Fitzgerald,* 457 U.S. 800, 819 n. 34, 102 S.Ct. 2727, 2739 n. 34, 73 L.Ed.2d 396 (1982).

be so serious that it violates contemporary standards of decency. *Id.* —— U.S. at ——, 113 S.Ct. at 2481.

A court may assess contemporary standards with the help of expert opinion, but such information does not define the "constitutional minima" and "cannot weigh as heavily in determining contemporary standards of decency as the public attitude toward a given sanction." *Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981) (quoting *Bell v. Wolfish,* 441 U.S. 520, 543–44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979) and *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

The subjective standard requires plaintiffs to prove that prison officials acted with "deliberate indifference" to inmate health or safety. *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). The Supreme Court has stated:

> A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* —— U.S. at ——, 114 S.Ct. at 1979.

■■■ A factfinder may make inferences about a prison official's state of mind by examining circumstantial evidence and in some cases, "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* —— U.S. at ——, 114 S.Ct. at 1981. Plaintiffs could prove that prison officials had actual knowledge of a risk if the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the

circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it...." *Id.* While prison officials may prove that they were ignorant of an obvious risk or thought of the risk as insubstantial, an official may not refuse to investigate facts or inferences that he strongly suspects indicate the existence of a condition which violates the Eighth Amendment. *Id.* —— U.S. at —— n. 8, 114 S.Ct. at 1982 n. 8. Officials who know of the substantial risk to inmate safety, however, may escape liability if they respond reasonably to the risk, even if the harm still occurs. *Id.* —— U.S. at ——–——, 114 S.Ct. at 1982–83.

■■■ In a suit for injunctive relief to correct a substantial risk of serious injury, the subjective dimension of the Eighth Amendment analysis should be determined by examining the attitudes and conduct of prison officials at the time suit is brought and thereafter. *Id.* —— U.S. at ——, 114 S.Ct. at 1983. If at trial a plaintiff adequately proves the existence of an objectively intolerable risk of serious injury, the prison authorities could not possibly claim that they are subjectively unaware of the risk since the trial itself puts them on notice. *Id.* —— U.S. at —— n. 9, 114 S.Ct. at 1983 n. 9. Despite the fact that officials might have been subjectively culpable at the beginning of the case, an injunction will not be issued if they prove during the litigation that "they [are] no longer deliberately indifferent to an objectively intolerable risk of harm and that they would not revert to their obduracy upon the cessation of litigation." *Id.*

## C. Sexual Harassment at the Annex, CTF and the Jail

### 1. The Eighth Amendment[38]

■■■ Under the objective standard, Plaintiffs have demonstrated a deprivation which

---

**38.** Whereas convicted Plaintiffs bring a cause of action under the Eighth Amendment, pretrial detainee Plaintiffs rely upon the Fifth Amendment guarantee of due process. *Brogsdale v. Barry,* 926 F.2d 1184, 1187 (D.C.Cir.1991). Though the unconstitutional conditions may be the same, "the threshold for establishing a constitutional violation is clearly lower for the pre-

trial detainees." *Brogsdale v. Barry,* 926 F.2d 1184, 1187 n. 4 (D.C.Cir.1991). The standard is whether the prison conditions "amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979). The Court's ruling that the sexual harassment visited upon women convicts violates the Eighth Amendment means *a fortiori,*

amounts to a wanton and unnecessary infliction of pain. The evidence revealed a level of sexual harassment which is so malicious that it violates contemporary standards of decency. The physical assaults endured by women prisoners at the Annex, CTF and the Jail unquestionably violate the Eighth Amendment. Rape, coerced sodomy, unsolicited touching of women prisoners' vaginas, breasts and buttocks by prison employees are "simply not part of the penalty that criminal offenders pay for their offenses against society." *See, Farmer v. Brennan,* — U.S. ——, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).

In combination, vulgar sexual remarks of prison officers, the lack of privacy within CTF cells and the refusal of some male guards to announce their presence in the living areas of women prisoners constitute a violation of the Eighth Amendment since they mutually heighten the psychological injury of women prisoners.

There is a substantial risk of injury when officers make sexual remarks in an environment where sexual assaults of women prisoners by officers are well known and inadequately addressed. In free society, a woman who experiences harassment may seek the protection of police officers, friends, coworkers or relevant social service agencies. She may also have the option of moving to locations where the harassment would no longer occur. In sharp contrast, the safety of women prisoners is entrusted to prison officials, some of whom harass women prisoners and many of whom tolerate the harassment. Furthermore, the women are tightly confined, making their escape from harassment as unlikely as escape from the jail itself.

Routine invasions of bodily privacy, such as men peering into women's cells at CTF or the unannounced presence of male guards in female living areas provide a reminder to women prisoners that their exposure to abuse is almost endless. Though the Court is aware that in some instances, security concerns will take priority over privacy interests, the evidence did not show security based reasons for an inability to furnish women some privacy or for the refusal of some guards to announce their presence. The exposure of prisoners' bodies without any justification is unacceptable and increases the level of anxiety experienced by women prisoners.[39]

The health problems created by sexual harassment furnish more than enough evidence to satisfy the objective component of the Eighth Amendment analysis. Dr. Susan Fiester, the Plaintiffs' expert in the area of sexual harassment and sexual misconduct, demonstrated that the abuse caused significant depression, nausea, frequent headaches, insomnia, fatigue, anxiety, irritability, nervousness, and a loss of self-esteem.[40] Though some female prisoners have not suffered as much as the named Plaintiffs in this case, sexual harassment within the three facilities is so pervasive that other women prisoners are very likely to suffer serious harm in the future.

■ The Court finds also that the Defendants have violated the subjective standard of the Eighth Amendment by acting with "deliberate indifference" to the condition of sexual harassment which women prisoners at the three facilities must endure. The Court finds that Defendants knew of and disregarded an excessive risk of sexual assaults and harassment of women prisoners. The evidence demonstrated that the women prisoners filed complaints with the police and they sent IGP's and letters of complaint to prison

---

that such harassment violates the Fifth Amendment rights of pretrial detainees.

In addition, Plaintiffs claim that the sexual harassment from which they suffer violates their rights to equal protection of the law under the Fifth Amendment. Since the Court holds that this sexual harassment violates the Eighth Amendment, the Court will not unnecessarily reach out to define the contours of the Fifth Amendment as applied to sexual harassment.

**39.** The Court will not review these complaints under a claim of a constitutional right of privacy because they are adequately addressed under the Eighth Amendment.

**40.** On the issue of damage caused by sexual harassment, the Court relies on the testimony of Dr. Fiester only to show the objective results of Defendants' actions. The Court takes the necessary next step of finding an objective violation of the Eighth Amendment by referring to contemporary standards of decency.

administrators. The circumstantial evidence allows at least the inference of deliberate indifference since the harassment was so obvious. Indeed, assaults are widely known by DCDC staff, vulgar comments are made openly and women are fondled publicly.

The Defendants demonstrate further disregard for women prisoners by failing to respond reasonably upon discovering instances of sexual harassment. There is no staff training on the subject of sexual harassment of women prisoners. There are no posted procedures for filing an IGP and no instructions or procedures for reporting harassment of women prisoners. Consequently, there is no clear understanding of what constitutes sexual harassment and how it should be reported. Some employees go to the Director, others do nothing but tell other employees who then pass the story along the grapevine. Some employees do not report an incident because the Defendants do not keep sensitive information confidential and do not conduct effective investigations.

The lack of confidentiality also causes women prisoners to suffer the additional trauma of having the small community in which they live know the details of a degrading assault. They may also be the targets of retaliation. By leaking private information prison officials coerce women prisoners and staff into silence and insulate themselves from scrutiny.

Those women prisoners who do pursue their case have little cause for hope because investigations are not taken seriously. The record shows that the Defendants often respond slowly and superficially to allegations of sexual misconduct. Mr. Krull admitted that the DCDC has no policy for investigating sexual misconduct. Mr. Henderson, as the Administrator of the Jail would not initiate investigations into sexual misconduct and left it to the police. Mr. Plaut believed that he had to wait for a conviction before he could take action. The invariable result is that cases "cannot be resolved" and officers who commit the assaults are often reassigned to another facility or allowed to remain in the same facility. The Court does not believe that a reasonable attempt to investigate sexual misconduct within the three facilities would so consistently achieve inconclusive results. The Court also believes that the reassignment of assaultive guards communicates to employees that sexual misconduct is not a serious matter, thus permitting future assaults.

Defendants also respond to allegations of sexual misconduct by placing the alleged victim in protective custody. Protective custody is the same treatment given to inmates when they are being punished. There is no reason for a women prisoner to feel safe in isolation when an attacker can gain access to her cell.

The Court finds that the Defendants have not proven during the litigation that they are no longer deliberately indifferent to the sexual harassment which occurs at the three facilities. Assaults continued to occur after the filing of this suit and a month before trial, a Deputy Warden told a woman prisoner that she should not provide information to a lawyer representing the Plaintiffs in this case. There is also no evidence that the Defendants have changed their approach to staff training, reporting and investigations.

The Court concludes that the Plaintiffs have proven an Eighth Amendment violation by demonstrating a level of sexual harassment that is objectively cruel and to which the Defendants are deliberately indifferent.

### 2. 42 U.S.C. § 1983

■ The sexual harassment which the Plaintiffs suffer is the result of a governmental custom which has not received formal approval through the body's official decision-making channels. In discussing sexual harassment, the former Administrator at CTF, Mr. Howard Ray Jr., suggested that sexual misconduct is a "custom" when he stated that it has always happened and will continue into the future.

The Court holds the Defendants liable under 42 U.S.C. § 1983 because guards at the three facilities inflict injury on the women while executing a government custom of sexual harassment, notwithstanding the Defendants' official policies regarding sexual misconduct.

The evidence also demonstrates that the Defendants fail to properly train their employees in the area of sexual harassment of women prisoners. The only substantive training in the area of sexual harassment focuses on harassment in the workplace. Considering the duties of officers at the three facilities, the need for training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, the Court finds that the Defendants are deliberately indifferent.

The Court, therefore, finds that the sexual harassment of women prisoners at the Annex, CTF and the Jail violates 42 U.S.C. § 1983.

### D. Obstetrical and Gynecological Care at CTF [41]

#### 1. D.C.Code § 24–442 (1989) [42]

■■■■ Plaintiffs claim that the lack of adequate obstetrical and gynecological care violates the law of the District of Columbia as embodied in D.C.Code § 24–442 (1989). This statute states in pertinent part:

> [The] Department of Corrections ... shall ... be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to [facilities under its jurisdiction].

D.C.Code § 24–442 (1989).

This statute encompasses the common law rule which imposes upon prison authorities and employees, a duty to exercise reasonable care in the protection and safekeeping of prisoners. *Hughes v. District of Columbia,* 425 A.2d 1299, 1302 (D.C.App.1981). In order to prevail on a claim under this statute, a "plaintiff must establish by competent evidence a standard of care; that the defendant violated the standard; and that such violation proximately caused injury to the plaintiff." *Id.* A plaintiff must establish a lack of proper correctional care by demonstrating with

competent expert testimony, or other supporting proof, that what occurred in the case was "a negligent deviation from the demonstrated acceptable standard." *Id.* at 1303. A plaintiff is required to offer expert testimony where the subject matter at issue is "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.App.1988). In the area of medical care, physicians owe the same standard of care to prisoners as physicians owe to private patients generally. *District of Columbia v. Mitchell,* 533 A.2d 629, 648 (D.C.App.1987).

■■■ Once plaintiffs demonstrate a deviation from the accepted standard they must then present evidence from which a reasonable trier of fact could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable. *Bell v. Jones,* 523 A.2d 982, 995 (D.C.App.1986).

■■■ The Plaintiffs established the appropriate standard of care through Dr. Major who is a board-certified physician specializing in obstetrics and gynecology. (Pls.Ex. 639; R. at 3–41.) Dr. Major referred to community and national standards in the field of obstetrics and gynecology, specifically the American College of Obstetrics and Gynecology. (R. 3–45.) He also relied on his 35 years of experience as an obstetrician and gynecologist. Five of those years were spent directing obstetrical and gynecological services in a correctional institution. (Pls.Ex. 639 at 1; R. at 3–45.)

The evidence demonstrates that the Defendants have deviated from the standard of acceptable medical care for women prisoners. The Court holds that the record supports Dr. Major's testimony as to the following devia-

---

**41.** Access to adequate obstetrical and gynecological care of women prisoners at the Annex is under review in the case of *Inmates of Three Lorton Facilities v. District of Columbia,* No. 92–1208 (D.D.C.) and issues relating to obstetrical and gynecological care at the Jail are controlled by *Campbell v. McGruder,* No. 1462–71 (D.D.C.).

**42.** The Court believes that the obstetrical and gynecological care of women prisoners at CTF is more appropriately addressed by the D.C.Code rather than the Eighth Amendment. The Court may consider this issue pursuant to it pendent jurisdiction over D.C.Code claims arising out of the same nucleus of operative fact. *Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 769 (D.C.Cir.1982).

tions from the general standard of adequate medical care: deficient gynecological examination and testing (R. 3–58.), inadequate testing for sexually transmitted diseases (R. 3–73 to 3–74.), inadequate follow-up care (R. 3–79 to 3–80, 3–83.), grossly inadequate health education (R. 3–86.), inadequate prenatal care (R. 3–94.), inadequate prenatal protocol (R. 3–95.) and ineffective prenatal education (R. 3–115.). These problems are compounded by the Defendants' inability to provide a reliable system of transportation or a confidential sick call process. Consequently, women prisoners miss appointments for lack of a vehicle or refuse help for fear of revealing the details of their medical history.

The Defendants even deviate from their own standards. The Defendants do not follow the Memorandum of Understanding which requires multilevel consultation between D.C. General and CTF, the Defendants do not follow their policy of thorough intake examinations and health education and they do not follow the policy of comprehensive prenatal care.[43]

These deviations are the proximate cause of foreseeable injury to the Plaintiffs. The Defendants' failure to thoroughly educate women prisoners results in refusals of medical help. Inadequate examinations and follow-up treatment permit cervical and breast cancer, opportunistic infections in AIDS patients, sterility as a result of chlamydia and gonorrhea, peritonitis from gonorrhea, and aortic aneurysms, dementia, psychosis or death from syphilis. Even conditions that are ultimately benign may cause great discomfort.

A penologically unnecessary arrangement which contributes to the diminution of life expectancy, an increase in pain, the delivery of a baby in a jail cell, and the anxiety of a prolonged wait for potentially life-saving medical procedures is intolerable. This is particularly true in the many cases where a lack of transportation or confidentiality impedes treatment.

Defendants have made some efforts to correct deficiencies in prenatal care by holding parenting classes, prenatal exercise classes and a "therapeutic community". Though these are positive measures, the creation of the exercise classes and the "therapeutic community" so close to trial calls into question the permanence of these measures. Nonetheless, the necessary reforms in obstetrical and gynecological care must be more comprehensive to bring the Defendants into compliance with D.C.Code § 24–442.

## 2. The Eighth Amendment

██ Plaintiffs raise several additional claims which are on the periphery of obstetrical and gynecological care: shackling of pregnant women prisoners, child visitation and child placement counseling.[44] The Court believes that these matters are best resolved by *Wilson v. Seiter* analysis rather than the approach of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) which addresses the provision of medical services to prisoners.

Plaintiffs have demonstrated that the manner in which the Defendants shackle pregnant women prisoners in the third trimester of pregnancy and immediately after delivery poses a risk so serious that it violates contemporary standards of decency. The Court understands that the Defendants may need to shackle a woman prisoner who has a history of assaultive behavior or escapes. In general, however, the physical limitations of a woman in the third trimester of pregnancy and the pain involved in delivery make complete shackling redundant and unacceptable in light of the risk of injury to a woman and baby. The Court believes that leg shackles adequately secure women prisoners without creating an inhumane condition of confinement during the third trimester. While a woman is in labor and shortly thereafter, however, the Court holds that shackling is inhumane.

---

43. In the area of prenatal nutrition, the Court does not find enough evidence to hold that the amount or quality of nutrition which Defendants provide to pregnant women prisoners violates D.C.Code § 24–442.

44. The Plaintiffs also claim that the Defendants provide insufficient post-partum counseling. The Court does not find enough evidence in the record to support this claim.

■ The combination of a lack of child visitation and inadequate child placement counseling at CTF constitute an Eighth Amendment violation because they have a mutually enforcing effect which results in an unacceptable risk of trauma for women prisoners who have recently delivered babies. Few events could be more stressful than the forced separation of a parent from his or her child. Though the injuries which flow from the Defendants' actions in this area are primarily psychological, there is nothing to suggest that the Eighth Amendment is limited to physical injury. *See Hudson v. McMillian,* 503 U.S. 1, 15, 112 S.Ct. 995, 1004, 117 L.Ed.2d 156 (1992) (concurring opinion, Blackmun, J.)

The Court finds that the Defendants have acted with deliberate indifference in these areas since the risk of injury to women prisoners is obvious. Deputy Warden Jones stated that he would not shackle a third trimester woman which suggests that he recognizes the risk.

The Defendants recognize that such a separation for women prisoners, in most cases, is extremely painful. It is, however, unfortunately necessary in order for a mother to serve her sentence. But to forbid child visitation while a baby is at D.C. General serves no penological purpose. Similarly, denial of adequate child placement counseling furthers no legitimate correctional policy. Both deprivations plainly heighten a mother's anxiety to an unreasonable level.

The evidence which emerged through litigation failed to demonstrate that the Defendants were no longer deliberately indifferent to the need for greater child visitation and child placement counseling. The evidence did not show that the Defendants no longer continue to fully shackle third trimester women prisoners.

### 3. 42 U.S.C. § 1983

The Defendants shackle third trimester pregnant women prisoners pursuant to official policy. Though the Defendants have a policy which calls for child placement coun-

seling, the Defendants are liable because the custom of the Defendants is to provide inadequate counseling in these areas. The Defendants deny adequate child visitation as a result of an unwritten but closely followed policy. The Court, therefore, finds that the shackling of third trimester women prisoners, inadequate child placement counseling and the lack of child visitation at CTF violate 42 U.S.C. § 1983.

### E. Fire Safety at the Annex

#### 1. The Eighth Amendment

■ The Plaintiffs have shown that the living conditions of women prisoners at the Annex present a risk of injury by fire so serious that it violates contemporary standards of decency. The Court finds the testimony of Mr. Jaeger, the Plaintiffs' expert in the field of fire safety, to be helpful with respect to the fire safety of the Annex.[45] His expert testimony demonstrated that several conditions working in concert create an objectively intolerable situation. The Annex dormitories are overcrowded, they carry a heavy combustible load, the walls cannot contain a fire within any room, only one fire exit consistently remains unlocked, there is no fire alarm system, there is no sprinkler system and fire drills are not regularly conducted. The Administration Building, the gymnasium and cafeteria have a poor fire alarm system.

The Court finds that each of these conditions has a mutually enforcing effect of exposing residents to an unconstitutionally intolerable risk of injury by fire. These conditions are at least very likely to cause serious illness and needless suffering. The Court does not have to wait for the Plaintiffs to be incinerated before it can order the Defendants to raise the level of fire safety at the Annex.

Application of the subjective standard of the Eighth Amendment shows that the Defendants have acted with deliberate indifference to the risk of fire at the Annex. The

---

**45.** Though Mr. Jaeger called the level of fire safety at the Annex "grossly inadequate", the Court must determine whether these specific inadequacies amount to a constitutional violation by referring to the contemporary standards of decency as reflected in what the public attitude toward the conditions at the Annex would be.

Court finds that the Defendants knew that a substantial risk of serious harm to inmate health or safety existed and they disregarded the risk.

The Annex fire hazards are longstanding, pervasive, well-documented, and expressly noted by prison officials. The Warden at Minimum has acknowledged that the absence of an adequate fire alarm system creates a hazard to residents. Even without Mr. Stempson's statements, Mr. Jaeger demonstrated the existence of fire hazards at the Annex, thus defeating any claim that the Defendants are not aware of fire hazards at the Annex.

■ The Defendants, however, have not proven during the litigation that they are no longer deliberately indifferent to the lack of fire safety at the Annex. Mr. Quander requested another survey to verify the findings in the a report that was accepted by the DCDC Fire Marshal. He had no knowledge as to who is responsible for the survey and when it will be finished. Even Mr. Stempson justified his request for a fire alarm system by referring to the cost of a lawsuit. Many conditions which preclude litigation, however, have nothing to do with living conditions in a facility. The Court can easily imagine several factors which might have prevented a suit in this case: prisoner ignorance of legal claims, inability to obtain counsel or the desire of short-term residents not to antagonize the administration so close to their release date. The fire hazards at the Annex should have been corrected regardless of any legal action. References to litigation costs suggest that the Defendants in this instance will respond only to court orders.

The Court holds that the Defendants' failure to move promptly to ameliorate the fire hazards at the Annex amounts to deliberate indifference.

### 2. 42 U.S.C. § 1983

■ Clearly, the Defendants do not have an official policy which requires the Defendants to create a firetrap at the Annex. But the Court does find that the deplorable level of fire safety at the Annex is the consequence of a decision by the Defendants not to correct the conditions which they acknowledge are hazardous.

In addition, the evidence demonstrates that written policies notwithstanding, the Defendants fail to train their employees in the area of fire safety and the Defendants do not follow their plan which calls for quarterly drills. Since the Defendants' inadequate training is so likely to cause injury to the approximately 170 women prisoners who must be evacuated during a fire, the Court concludes that the Defendants have been deliberately indifferent. Consequently, the Court finds that the lack of fire safety at the Annex violates 42 U.S.C. § 1983.

### F. General Conditions at the Annex
#### 1. The Eighth Amendment

■ The Plaintiffs have shown that the living conditions of women prisoners at the Annex violate contemporary standards of decency. The combination of certain conditions of confinement satisfies the objective component of Eighth Amendment analysis because the conditions are very likely to cause serious illness and needless suffering. The infestation of roaches, torn mattresses, inadequate bathing and toilet facilities, excessive crowding, lack of mechanical ventilation, unclean floors, inadequate drainage, inadequate lighting, and uncovered dumpsters all have been shown to raise the risk of illness and injury to a constitutionally unacceptable level. The filthy condition of the kitchen area at Minimum, food served at hazardously low temperatures, the failure to use liners in the laundry carts, and inadequate ventilation at the printing and garment shop also expose women prisoners to a similarly unacceptable risk of illness and injury.

The Court has located conditions which violate the Eighth Amendment not because they produce surroundings which are unattractive or food which is unappetizing. These conditions are cruel and unusual because they combine to create an unconstitutionally high exposure to illness or injury. Furthermore, the Court finds these conditions unconstitutional not because the Plaintiffs' environmental health expert, Mr. Duel, summarized them as "unacceptable". They are unconstitutional because his expert testi-

mony specifically demonstrated the particular illnesses and injuries which are likely to result from each of the conditions and because the Court finds that these hazards violate contemporary standards of decency.

■ Apart from the previously mentioned conditions, the Court is reluctant to find unconstitutional anything which simply increases "stress" unless it is truly egregious. For this reason the Court does not find that the daytime noise levels significantly threaten the health of women prisoners.

Application of the subjective standard of the Eighth Amendment shows that the Defendants have acted with deliberate indifference to the inhumane conditions at the Annex. The Defendants were aware of facts from which they inferred the existence of a substantial risk of serious harm to women prisoners and they disregarded the risk. Mr. Krull's suggestion that the placement of short-term offenders at the Annex would reduce the risk of a lawsuit suggests a general strategy to avoid repairing poor conditions.

But the record also contains much evidence of Defendants' recognition of specific problems. Ms. Gilmore recognized in July 1993 that repair needs of the Annex had reached "crisis proportions." The record also contains letters in which inmates notified the administration about other "deplorable" conditions and even offered to repair the defects. The Court believes at the very least, that conditions at the Annex are so obviously unhealthy that the Court may infer the Defendants' deliberate indifference.

Yet, the Defendants have not proven during the litigation that they are no longer deliberately indifferent to the inhumane conditions at the Annex. Since the Defendants have made no significant improvements at the Annex they certainly cannot claim that they have responded reasonably to the risk since discovering it. A June 1994 inspection revealed little change: a repaired roof, a replaced kitchen ceiling, new lighting for the walk-in coolers, bathrooms for women at the garment shop and improved delivery of food

at the industries. The improvements, occurring so close to trial and easily capable of deterioration, do not persuade the Court that these limited areas of concern are permanently improved. Even if these changes were permanent, they would not bring the level of safety at the Annex to the constitutional minimum of acceptability.

### 2. 42 U.S.C. § 1983

■ As with the fire hazards at the Annex the Court cannot find a policy statement which permits such awful conditions to persist at the Annex. Nonetheless, these conditions remain because the Defendants customarily refuse to provide residents at the Annex with a living environment that satisfies the Constitutional minimum. Consequently, the Court finds that the unhealthy living conditions at the Annex violate 42 U.S.C. § 1983.

### G. Fire Safety at CTF

#### 1. D.C.Code § 24–442 (1989) [46]

■ The evidence revealed a variety of problems at CTF. There is a lack of maintenance and testing of certain elements of the present fire protection system. The sprinkler system is not being adequately maintained and tested. There is maintenance of the fire pump but no testing. Fire drills are held infrequently. There is water leakage in the basement where electrical equipment is exposed. Storage in some of the culinary spaces block the sprinkler system.

Plaintiffs claim that the lack of fire safety violates the law of the District of Columbia as embodied in D.C.Code § 24–442 (1989). The Court infers from the statute an obligation of prison authorities and employees to exercise reasonable care in the "protection" and "safekeeping" of prisoners from fire hazards. Mr. Justin Taylor, the Defendants' expert in the field of fire safety, testified that the sprinkler system should be tested quarterly. Mr. Jaeger demonstrated that standards require annual testing of the fire pump. Mr. Jaeger also explained how the leakage of water threatened to get into the

---

**46.** The Court believes that the issue of fire safety at CTF is more appropriately addressed by the D.C.Code. As with the issue of obstetrical and gynecological care at CTF, the Court considers this issue pursuant to it pendent jurisdiction over D.C.Code claims arising out of the same nucleus of operative fact. *Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 769 (D.C.Cir.1982).

electrical conduit and electrical equipment and cause a fire. The national standard for fire drills calls for four drills per shift per year.

The Court finds that the Defendants failure to test the sprinkler system quarterly, the failure to maintain the sprinkler system, the failure to test the fire pump annually, the leakage of water in the basement and culinary area, the failure to conduct adequate fire drills and the blocking of the sprinklers in the culinary spaces all violate D.C.Code § 24–442.

## H. General Conditions at CTF

### 1. The Eighth Amendment

■ The Plaintiffs have shown that the living conditions of women at CTF present a health risk so serious that it violates contemporary standards of decency.

The combination of conditions surrounding the inadequate heating unit create an objective violation of the Eighth Amendment. The malfunction in the heating unit causes freezing temperatures in cells. In addition, not all women are given an adequate number of blankets for warmth. This is the precise example of an Eighth Amendment violation offered by the Supreme Court in *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

Other conditions at CTF combine to increase the risk of illness among women prisoners. The evidence demonstrated a problem with mice, a lack of liners in the laundry carts, inoperable toilets in cells, a lack of cleaning supplies, unsanitary kitchen facilities, hazardous special diet meals and shower leaks which cause ceiling tiles to fall. In addition, the malfunction of the heating unit causes poor ventilation. As with similar conditions at the Annex, the expert testimony demonstrated a clear link between these conditions and various diseases and injury.

The Defendants have acted with deliberate indifference to these conditions at CTF. The Court finds that the Defendants have been aware of these conditions, know of their danger and have not made any significant changes. Since January 1993, the Defen-

dants have known that cells housing women prisoners were extremely cold. The Defendants have known about the rodent problem since at least September 1993. CTF staff admitted to Mr. Duel that there was an internal distribution problem with supplies. (R. 6–62 to 63.)

The Defendants have not proven during the litigation that they are no longer deliberately indifferent to the inhumane conditions at CTF. Mr. White, Chief of Facilities at CTF, informed Mr. Duel that he has doubts about recent efforts to fix the heating system. There is no evidence that problems with food preparation, mice, laundry carts, toilets, cleaning supplies and shower ceiling tiles have been fixed. The situation with the special diets at CTF had improved but the nutritionist who made many of the improvements in food delivery may not have long-term employment at CTF. The Court is not satisfied that the positive changes in this area are permanent.

### 2. 42 U.S.C. § 1983

■ The Court finds that the longstanding health hazards which exist at CTF are the result of a decision by the DCDC not to promptly abate these hazardous conditions. The Court therefore, finds that the Defendants are liable under 42 U.S.C. § 1983.

## I. Title IX of the Education Amendments of 1972

Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a).[47] The Plaintiffs ask the Court to apply this statute to the programs offered to women prisoners at the Annex and CTF.

Not many cases in the federal courts have dealt with the issue of Title IX's applicability to prison education programs or activities. The Ninth Circuit, however, recently explored the issue in *Jeldness v. Pearce*, 30

47. The Defendants concede that they receive fed- eral funding. (Defs. Answer to Int. No. 2.)

F.3d 1220 (9th Cir.1994). That case involved a class of women prisoners who alleged, *inter alia,* that the Oregon State Department of Corrections violated Title IX and its regulations by discriminating against women prisoners in six educational and vocational training programs in the Oregon penal system. *Id.* at 1222. The court in *Jeldness* held that "state prisons receiving federal funds are required by Title IX to make reasonable efforts to offer the same educational opportunities to women as to men. Although the programs need not be identical in number or content, women must have reasonable opportunities for similar studies and must have an equal opportunity to participate in programs of comparable quality." *Id.* at 1229. The Court believes that this is an accurate reading of Title IX.

The plain language of Title IX indicates that the statute applies to "any education program or activity receiving Federal financial assistance" with certain statutory exceptions. 20 U.S.C. § 1681(a). Prisons are not listed as an exception to Title IX. The Court has no reason to infer from the statute or its regulations that Congress intended for Title IX not to cover prisons. As the *Jeldness* court indicated, Congress amended Title IX on two occasions after two federal courts applied the statute to prisons, yet Congress did not add an exemption for prisons on either occasion. *See, id.* at 1225 (referring to *Canterino v. Wilson,* 546 F.Supp. 174 (W.D.Ken.1982), vacated on other grounds, 869 F.2d 948 (6th Cir.1989), and *Beehler v. Jeffes,* 664 F.Supp. 931 (M.D.Pa. 1986)).

In order to determine the extent of Title IX's coverage, courts have referred to Title VI of the Civil Rights Act of 1964. Since Title IX uses the same language as Title VI, courts generally hold that they require the same levels of protection and equality. *Cannon v. University of Chicago,* 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979). But Title VI is a useful guide in construing Title IX only to the extent that the language and history of Title IX do not suggest a contrary interpretation. *Northhaven Board of Education v. Bell,* 456 U.S. 512, 529, 102 S.Ct. 1912, 1922, 72 L.Ed.2d 299 (1982). Though the Supreme Court has stated that the protection provided by Title VI is not broader than that offered by the Equal Protection Clause of the Fifth Amendment, *University of California Regents v. Bakke,* 438 U.S. 265, 287, 325, 98 S.Ct. 2733, 2746–47, 2766, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.; Brennan, White, Marshall, Blackmun, JJ., concurring), Title IX and Title VI use the same language and therefore, as a matter of statutory interpretation, they should be read to require the same levels of protection and equality. *Jeldness v. Pearce,* 30 F.3d 1220, 1227 (9th Cir.1994). "They should not be read to require different levels of protection [simply] because the Equal Protection Clause is interpreted differently for race than for gender." *Id.* at 1227–28.

During congressional debates on the provisions which became Title IX, Senator Bayh, who introduced the legislation stated:

> While the impact of this amendment would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an *equal* chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.

118 Cong.Rec. 5808. (1972) (Emphasis added). In response to questions about the legislation, the Senator said, "This amendment sets no quotas. It only guarantees *equality* of opportunity." 118 Cong.Rec. 5812. (1972) (Emphasis added).[48]

In *Northhaven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), the Supreme Court examined Title

---

48. Senator Bayh's intentions were made clear the previous year when he introduced similar legislation and stated: "What we are trying to do is provide *equal* access for women and men students to the educational process...." 117 Cong.Rec. 30407 (1971) (emphasis added), and

"the bill ... seeks to assure *complete equality* of access to educational opportunity." 117 Cong. Rec. 30412 (1971) (emphasis added). The Senate never voted on this measure because it was ruled nongermane. 117 Cong.Rec. 30415 (1971).

IX's legislative history and held, "Although the statements of one legislator made during debate may not be controlling ..., Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction." *Id.* at 526–27, 102 S.Ct. at 1920–21. The legislative history, therefore, makes clear that Title IX requires equality of treatment, nothing less.

The language of Title IX's implementing regulations suggest that they apply to correctional institutions as well. They propose to cover "any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution...." 34 C.F.R. § 106.1. The regulations also define a "recipient" as

> [A]ny State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. sec. 106.2(h). Like Title IX, the regulations list specific exceptions which do not include prisons.

Title IX's implementing regulations specifically target areas of concern. They prohibit sexual discrimination "under any academic, extracurricular, ... occupational training or other education program or activity operated" by an entity that receives federal funds. 34 C.F.R. § 106.31(a). The denial of access to course offerings on the basis of sex is forbidden. 34 C.F.R. § 106.34. A recipient of federal funds must also provide equal athletic opportunity. 34 C.F.R. § 106.41. Finally, the regulations prohibit discrimination in the provision of employment opportunities and apprentice training programs. 34 C.F.R. § 106.38 and Pt. 100, App. B, VII–A & VII–B.

Under Title IX and its implementing regulations, prisons may not have to offer as many classes in the typically smaller female prison as opposed to the typically larger male prison, but the number of classes offered should at least be proportionate, not just to the total number of inmates, but to the number of inmates desiring to take educational programs. *Jeldness v. Pearce,* 30 F.3d 1220, 1229 (9th Cir.1994). In addressing the requirements of Title IX, a prison may not prevail by simply using penological necessity as a defense since it is just one factor in how the equality principles of Title IX are to be applied. *Id.* at 1230. In addition, a desire to preserve the state's limited resources cannot be used to justify an allocation of those resources which unfairly denies women equal access to programs routinely available to men. *Canterino v. Wilson,* 546 F.Supp. 174, 211 (W.D.Ky.1982).

There is disagreement in the federal courts as to the state of mind required for a violation of Title IX. The Court again notes the Supreme Court's holding that "[t]he drafters of Title IX explicitly assumed that it would be interpreted [like] ... Title VI....", *Cannon v. University of Chicago,* 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979), and that a majority of justices have stated that Title VI requires "intentional discrimination" in order to prove a statutory violation. *See Guardians Ass'n v. Civil Service Comm'n,* 463 U.S. 582, 608 n. 1, 103 S.Ct. 3221, 3235 n. 1, 77 L.Ed.2d 866 (1983) (Powell, J., concurring) ("Seven members of the Court agree that a violation of [Title VI] requires proof of discriminatory intent.").[49]

---

**49.** Under Title VI's implementing regulations, proof of discriminatory effect suffices to establish liability. *See Guardians Ass'n v. Civil Service Comm'n,* 463 U.S. 582, 584 n. 2, 103 S.Ct. 3221, 3223 n. 2, 77 L.Ed.2d 866 (1983) (opinion of White, J.). Some courts conclude that discriminatory intent is equally unnecessary for a violation of Title IX's regulations. *See Roberts v. Colorado State Board of Agriculture,* 998 F.2d 824, 832–33 (10th Cir.1993); *Haffer v. Temple University,* 678 F.Supp. 517, 539–40 (E.D.Pa. 1987). A review of Title IX's implementing regulations demonstrates an emphasis on the "effects" and "impact" of a defendant's policies. The Court finds no requirement of intent in the regulations. *See* 34 C.F.R. §§ 106.21(b)(2) (prohibits tests for admission which have disproportionately adverse effect, unless test is valid predictor), 106.22 (no admission preference for graduates of single sex schools if preference has

■ Discriminatory intent, however, is only an issue in cases involving facially neutral policies. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). When a classification is expressly defined in terms of gender, an inquiry into intent is unnecessary. *Canterino v. Barber,* 564 F.Supp. 711, 714 (W.D.Ky.1983). Defendants policy of segregating male and female prisoners is just such a gender-based policy. By virtue of their gender, women prisoners are sent to certain facilities which offer program opportunities that are different from those offered in the male facilities. Though the reason for sex-based segregation in prisons is rational, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *United Automobile Workers v. Johnson Controls,* 499 U.S. 187, 199, 111 S.Ct. 1196, 1203–1204, 113 L.Ed.2d 158 (1991).

### 1. "Similarly Situated" Analysis

The Court will compare prisoners who are similarly situated by virtue of their similar custody levels, sentence structures and purposes of incarceration. The Court finds that women prisoners at the Annex are similarly situated to the male prisoners at Minimum and the Court also finds that women prisoners at CTF are similarly situated to the male prisoners at Occoquan, Central and Medium.

The women prisoners incarcerated at the Annex like the male prisoners at Minimum are within two years of a presumptive release date. (Pls.Ex. 621 at WP00034, WP00033 at 6.) Both of these populations are preparing for release into the community and therefore, have the same need to fully prepare themselves for this stage of their lives.

The women prisoners at CTF are medium custody, general population inmates.[50] Medium custody general population men are sent, in order of security level, to either Occoquan, Central or Medium. (Gibbons Dep. at 43–44.) A comparison to CTF men would be inappropriate because the men reside at CTF for either short-term diagnostic attention or a voluntary 18–month intensive substance abuse program. (Pls.Ex. 319.) In contrast, the Plaintiffs who reside at CTF do not choose to live at there. (R. 8–66.)

■ Each of the male facilities perform different functions. Occoquan is a sentence-serving institution for "male felons who decline to participate in the high intensity programming offered at Central Facility." (Pls.Ex. 621 at WP00035; Gibbons Dep. at 44.) The purpose of Central is to provide program opportunities to prisoners "who wish to participate in high intensity and comprehensive programming." (Pls.Ex. 621 at WP00032.) Medium is designed to prepare prisoners for the transition to a minimum security facility, a halfway house or parole. (Id. at 44.; Krull at 35.) It is possible for the men at Medium to transfer to the other two facilities and men from the other facilities may be sent to Medium. (Krull Dep. at 34.) If an inmate at Medium has certain programming needs that are only available at Occoquan or Central then the Defendants will try to send him to one of those facilities. (Krull Dep. at 38.) The record, therefore, demonstrates that medium custody men generally have access to all of the programs offered at the three medium custody male facilities.

■ The Defendants argue that because women prisoners have needs which are unique to women prisoners, a comparison to male prisoners is inappropriate. (Defs. Trial Brief at 2–18.) The Defendants point to a

discriminatory effect), 106.23(b) (no recruitment primarily at single sex schools if it has discriminatory effect), 106.34(d) (prohibits physical education skill standard which has adverse effect on one sex), 106.37(b) (prohibits award of sex-restricted forms of financial assistance which have overall effect of sexual discrimination), 106.52 (prohibits any employment criterion which has disproportionate adverse impact unless it validly predicts successful performance), 106.53(b) (prohibits recruitment at entities which furnish job

applicants of one sex if it has effect of sexual discrimination); *See also Sharif By Salahuddin v. New York State Education Dept.,* 709 F.Supp. 345, 361 (S.D.N.Y.1989).

**50.** At CTF, 104 women are serving sentences of one to two years, 84 women are serving sentences of three to four years and 19 women are serving sentences of five or more years. (R. 11–45.)

variety of differences to support their argument, although there is evidence that the Defendants recognize that the "programming needs [of females] are the same as those for males." (Pls.Ex. 291 at DC0018353.)

The Defendants argue that women prisoners are less violent than male prisoners and therefore, need more supervision. (Id. at 11.) This argument, in the context of an all female program, is counterintuitive. Supervision generally increases with an inmate population that poses a greater risk of violence. This distinction in the context of a co-correctional program is nothing more than a disguised "prison security" argument which is appropriate to a determination of how a program will be implemented, not whether two groups are similarly situated.

The Defendants argue that women prisoners are victims of sexual abuse in greater numbers than male prisoners and therefore have lower self-esteem which makes them more dependent than men. (Id.) The Court does not find any evidence that women prisoners are afflicted with lower self-esteem than male prisoners or that they are more dependent than men. The evidence demonstrates that women prisoners are victims of sexual abuse in numbers disproportionate to men. This abuse causes a loss of self-esteem. Logically, this does not mean that male prisoners could not also suffer from low self-esteem for any number of other reasons.

The Defendants argue that women have more acute problems with substance abuse. (Id. at 11–12.) The record does not demonstrate this to be true either. The programming inequalities that exist rest on top of presumptively equal access to drug treatment.

The Defendants argue that women are more likely to have the responsibility of caring for a child. (Id. at 12.) It would be truly ironic if this unfortunately true difference succeeded as a rationale for unequal opportunity in educational, recreational, religious and work programs. Though prisons should have leeway in determining how best to address the parenting responsibilities of women, "parenting programs" are not a valid

substitute for educational and occupational programs. Title IX embodies a Congressional recognition that education and employment are the primary routes by which women may materially improve their lives. The Defendants emphasis on other programs subverts the policies underlying the statute.

The Defendants finally argue that women prisoners have unique employment needs because they have less support in the community than men. (Id.) As with the previous argument, the Defendants prove too much. The lack of support added to child care responsibilities supports an argument for greater access to educational and occupational programs, not less.

The Court believes that the "unique needs and characteristics" mentioned by the Defendants, if true, should be addressed above and beyond their need for the programs at issue in this case, not as a substitute. A majority of the "unique characteristics" mentioned by the Defendants are also some of the burdens which historically have prevented women from achieving equality of opportunity. To use these characteristics to defeat a comparison of men and women prisoners would vitiate Title IX and also suggest that men and women could never be compared.

### 2. Title IX and Programs at the Annex [51]

At the Annex, the Defendants have not made reasonable efforts to offer the same educational opportunities to women as to men. For the most part, women prisoners do not have reasonable opportunities for similar studies and do not have an equal opportunity to participate in programs of comparable quality. The Court will briefly analyze each area of programs under Title IX and its implementing regulations.

The failure to provide women with equal access to academic and college education violates Title IX and 34 C.F.R. § 106.31(a). In the area of academic and college education, women prisoners receive only half of the male prisoners' access to ABE and GED classes. This is insufficient, not simply be-

---

51. Plaintiffs do not challenge the programs available to women prisoners at the Jail because these

issues are controlled by the orders and decrees in *Campbell v. McGruder,* No. 1462–71 (D.D.C.)

cause it takes longer for women to finish the courses, but because they are unable to win good time credits. Course length is important particularly at the Annex because women serve shorter sentences and need to complete the courses before they are released.

The inequality is worsened by the Defendants failure to anticipate foreseeable problems. Classes have been canceled upon the teacher's illness and a broken air conditioner. The Defendants could easily ameliorate this problem by adding an additional teacher and providing adequate facilities.

In the area of college education, Men at Minimum and women at the Annex have access to 2 pre-college UDC classes. The Court holds, however, that women do not have a reasonable opportunity for similar studies because the Defendants do not escort the women prisoners to class in a timely manner.

In the area of vocational training and apprenticeships, women at the Annex and men at Minimum have equivalent access to meager offerings. The Court finds no violation of Title IX.

The Defendants failure to provide equivalent opportunity in the area of work details violates Title IX, 34 C.F.R. § 106.38(b), 34 C.F.R. § 106.31(a), and 34 C.F.R. Pt. 100, App. B, VII–A. Work details at Minimum are not only more numerous but better in quality than those offered at the Annex. The men perform details that prepare them for trades which command better salaries outside of prison. There is hardly a comparison of the stereotypical details at the Annex (receptionist, housekeeper, beautician, etc.) and the skilled details at Minimum (carpentry, electrical, mechanical, etc.)

The Court does not find that the Defendants offer women prisoners at the Annex unequal access to industrial programs in violation of Title IX. Women may participate in the garment and print shops while men may participate in the new industries of dairy and landscape. While the Plaintiffs argue that women prisoners could work well at the other industries at Central, they have failed to prove that women prisoners at the Annex do not receive industrial opportunities equivalent to male prisoners at Minimum. The Plaintiffs' argument may make sense as policy but it falls short of demonstrating inequality.

In the area of work training the Defendants violate Title IX and 34 C.F.R. §§ 106.31(a), 106.38(a)(1) and Pt. 100, App. B, VII–A. The large difference in participation between men and women is the result of sluggish processing of paperwork, the absence of an automobile to take women to interviews and the failure to publicize work training opportunities at the Annex. Dr. Ryan, the Defendants' expert penologist, gave an example of a good work release program that failed because among other things the facility did not provide the women with sufficient transportation. (R. 11–53 to 11–54.) Subsequent programs succeeded because transportation, counseling, education and child support were furnished. (R. 11–54.)

As in the other areas, men received training for jobs which required more skill than those jobs held by the women. Though some of these jobs involve stereotypically male skills, the Defendants may not justify unequal treatment by pointing to the limited availability of some occupations for women. 34 C.F.R. § 106.7.

The Defendants failure to provide comparable recreational facilities violates Title IX and 34 C.F.R. § 106.41(a), (c) and the failure to provide equivalent activities violates Title IX and 34 C.F.R. § 106.31(a). Access to a trailer for a couple of hours a day and the Minimum facilities for several hours a week is not comparable to the recreational opportunities for men at Minimum who have almost unlimited access to a gymnasium, a weight trailer and a ball field. The number of men might explain the size of different facilities but it does not explain the large difference in quality. There is also no reason why the women do not have anything remotely similar to the drama club offered to the men at Minimum.

Women prisoners do not have equal opportunity in the area of religious programs in violation of Title IX and 34 C.F.R. § 106.31(a). The women have only limited

access to a chaplain. In addition, the Annex does not offer a place to worship which is comparable to the men's chapel at Minimum. Distractions occur as a result of the need to share space with prisoner visitations, thus harming the quality religious offerings.

### 3. Title IX and Programs at CTF

■ The Defendants have not made reasonable efforts to offer the same educational opportunities to women as to men. Women at CTF do not have reasonable opportunities for similar studies and do not have an equal opportunity to participate in programs of comparable quality.

The pronounced inequality in academic and college educational opportunity clearly violates Title IX and 34 C.F.R. § 106.31(a). Not one woman at CTF has the opportunity to receive the amount of education offered to similarly situated men. The women of CTF have only 3 hours of ABE or GED classes whereas the men at Medium and Occoquan have 5½ hours of study and the men at Central have 8 hours of study. Women prisoners are also hindered by tardy escorts and class schedules which conflict with vocational classes.

The availability of college education is abysmal as well. A woman must first apply for a Pell grant which similarly situated men generally need not do. Then she must try to learn through the use of a computer without the aid of a teacher. Even if she is successful the limit of her opportunity is an AA degree. Men at all of the other facilities may obtain a four year college degree from instructors who teach at the facilities.

Women prisoners suffer obvious inequalities in vocational programs and apprenticeships in violation of Title IX and 34 C.F.R. § 106.31(a). Vocational opportunities for women at CTF are virtually non-existent. The Graphic Arts program is closed off to medium custody women. The other offerings are stereotypically female and have no classroom component. Similarly situated men at Central have numerous opportunities to participate in substantive vocational programs. Men at Occoquan and Medium have several offerings. Apprenticeships are not available to women at CTF whereas there are some at Central and one at Occoquan.

■ The lack of equivalent opportunity in the area of work details violates Title IX, 34 C.F.R. § 106.38(b), 34 C.F.R. § 106.31(a), and 34 C.F.R. Pt. 100, App. B, VII–A. Work details at CTF are stereotypically female and low-skilled. They are not nearly equivalent to the details at the men's facilities which help men to establish marketable trades.

The lack of equivalent opportunity in the area of industries violates Title IX, 34 C.F.R. § 106.38(b), 34 C.F.R. § 106.31(a), and 34 C.F.R. Pt. 100, App. B, VII–A. There are no industries at CTF and the Defendants have no plausible excuse for the absence of industrial opportunities. Defendants sound a note of alarm at the thought of female participation in industries at Central but the Defendants concede that women prisoners do fine work in the garment shop. Furthermore, there is no evidence of a bona fide attempt by Defendants to establish an industry for women prisoners at CTF.

As with the academic education, the denial of equal recreation time is a result of the controlled-movement design of the facility. In a situation of lopsided opportunities this may be the most egregious inequality. Similarly situated men are given a degree of recreational freedom that might surprise many citizens while women at CTF, the overwhelming majority of whom are non-violent, experience a degree of confinement more stringent than men at the Maximum Facility. This violates Title IX and 34 C.F.R. § 106.41(a).

### J. The Fifth Amendment and Equal Protection

■ Since the remedial devices in Title IX sufficiently cover discrimination in educational programs, the Court will not review those programs under the Equal Protection Clause. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981) (remedial devices in a federal statute may demonstrate congressional intent to preclude suit under § 1983). This is consistent with the federal policy of

avoiding constitutional adjudication where not absolutely essential to the disposition of a case. *Hagans v. Lavine,* 415 U.S. 528, 547 n. 12, 94 S.Ct. 1372, 1384 n. 12, 39 L.Ed.2d 577 (1974). The Court will however, use the Equal Protection clause to review the denial of smoking privileges at CTF since that claim is not covered by Title IX.[52]

 The fundamental purpose of the Equal Protection Clause is to compel the government to treat equally all people who are similarly situated. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976).[53] Anyone defending such a policy must provide an "exceedingly persuasive justification" for it. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).

Women prisoners at CTF may not smoke because smoking is inconsistent with the substance abuse treatment of other inmates with whom the women share the facility. The Court holds that the treatment of inmates for substance abuse is an important governmental objective and the non-smoking policy is substantially related to that objective. The smoking policy of CTF, therefore, does not violate the Equal Protection Clause.

## *ORDER FOR DECLARATORY AND INJUNCTIVE RELIEF*

Based upon the Court's findings of fact and conclusions of law, it is by the Court this 13th day of December 1994, **ORDERED** that:

1. The Defendants' actions and inactions violated and continue to violate the Plaintiff class members' rights under the Fifth and Eighth Amendments to the United States Constitution, 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1988), and the District of Columbia Code §§ 24–442; and

2. The Defendants are ordered to take all action necessary to remedy and prevent the violations of the Plaintiffs' above-mentioned rights. The Defendants are ordered to take the following specific measures in the areas of sexual harassment, obstetrical and gynecological care, programs and opportunities, and environmental and fire safety. All measures shall be completed and in effect within six months of the date of this Order, unless otherwise specified.

## I. *SEXUAL HARASSMENT*

3. Within 60 days, the Defendants shall write and follow a Department Order prohibiting sexual harassment involving District of Columbia Department of Corrections (DCDC) employees and women prisoners. The Defendants shall post and circulate the Department Order in accordance with departmental policy.

4. Under this policy the DCDC has the obligation to take appropriate steps to prevent and remedy sexual harassment committed by its own employees.

5. One or more members from the office of Grace M. Lopes, Special Officer of the U.S. District Court for the District of Columbia, will monitor allegations of sexual harassment at each facility in which women prisoners are housed. The monitor(s) shall log in each allegation of sexual harassment, investigate the allegations, submit the results of the investigation to the Warden of the relevant facility and the Director of the DCDC and keep records of the Defendants' resolution of the matter, including disciplinary actions, of such claims.

6. The monitor(s) shall investigate all outstanding allegations of sexual harassment

---

**52.** Equal protection principles apply to federal action through the due process clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

**53.** The Court does not reach the issue of whether this case is distinguishable from *Pitts v. Thornburgh,* 866 F.2d 1450 (D.C.Cir.1989), and subject to the standard provided in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), because the Court holds that the Defendants have not violated the Plaintiffs' Equal Protection rights even under the heightened scrutiny standard.

and shall submit a report on each allegation to the Warden of the relevant facility, and to the Director of the DCDC.

7. Prohibited conduct under the policy shall be defined as:

a. Sexual harassment which includes:

(1) all unwelcome sexual activity directed by any DCDC employee at a prisoner including acts of sexual intercourse, oral sex, or sexual touching and any attempt to commit these acts; and

(2) all unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature directed by any DCDC employee at a prisoner; and

b. Invasions of women prisoners' privacy by male employees without a valid penological reason, including the failure of any male employee to announce his presence when entering a female housing unit.

c. Retaliation for reporting complaints of, assisting any individual in making a report of, or cooperating in an investigation of sexual harassment, regardless of the merits or the disposition of the underlying complaint. Retaliatory conduct includes the following actions taken against a prisoner in response to that prisoner's complaint of sexual harassment or cooperation in the reporting or investigation of sexual harassment: disciplining, changing work or program assignments of, transferring to another facility of, or placing under involuntary protective custody any prisoner.

d. Any breach of confidentiality by any employee concerning any report of sexual harassment.

e. Any interference with investigations of sexual harassment.

8. Penalties for prohibited conduct under the policy shall be worked out by the Director of the DCDC and the Court's Special Officer Ms. Grace Lopes within 30 days of this Order.

9. Women prisoners shall be able to report instances of sexual harassment through the existing Inmate Grievance Procedure (IGP) as specified in Department Order 4030.1D. The Defendants shall strictly adhere to the Inmate Grievance Procedure and shall establish an Inmate Grievance Advisory Committee (IGAC) as required by Section VII(C) of Department Order 4030.1D.

10. Women prisoners shall also be able to submit IGP's or complaints concerning sexual harassment in any form, orally or in writing, to any DCDC employee, who must submit the information, in writing, to the monitor(s) and Warden of the facility within 24 hours of receiving the information. Women prisoners may also submit IGP's or complaints to an prisoner representative to the IGAC.

11. The Defendants shall establish a confidential hot line, under the supervision of the monitor(s), through which women prisoners can report allegations of sexual harassment.

12. Each employee shall be required to report any information, from any source, concerning sexual harassment, in writing, to the Warden of the facility and to the monitor(s) within 24 hours of receiving the information. Failure of an employee to report any suspected incident of sexual harassment shall subject the employee to discipline. If a prisoner so requests, the prisoner shall be treated as an anonymous informant.

13. The monitor(s) shall ensure that each reported violation of the policy is thoroughly investigated and documented. The monitor(s) shall submit a final written report to the Warden of the institution; the report shall include factual findings and a conclusion as to whether a preponderance of evidence shows that a violation of the sexual harassment policy occurred. Within 48 hours after the Warden receives the monitor(s)' report, the Defendants shall inform the complaining woman prisoner, in writing, of the outcome of the investigation. The Warden shall take appropriate action as detailed in the schedule of penalties.

14. Upon receipt of any allegation of an act of unwelcome sexual intercourse or any allegation of unwelcome sexual touching, the monitor(s) and the institution must notify the proper law enforcement agency. The monitor(s) shall communicate with the law enforcement agency concerning the status of any investigation. The monitor(s) must peri-

odically document the status of police investigations. The occurrence of a police investigation does not relieve the monitor(s) of the duty to investigate.

15. The identity of the target of the alleged sexual harassment shall be revealed only to those who have an immediate need to know, including the monitor(s), the alleged harasser(s) or retaliator(s) and any witnesses. All parties contacted in the course of an investigation will be advised that any retaliation, reprisal, or breach of confidentiality is a separate actionable offense as provided in the schedule of penalties.

16. Any prisoner who is dissatisfied with any investigation or resolution of an allegation of sexual harassment may appeal to the Director of the DCDC within 15 days of receiving written notice of the outcome of the investigation. The Director must respond within 15 days.

17. Within 90 days, a trainer from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall conduct mandatory training on sexual harassment for all DCDC employees who work with women prisoners. The trainer shall be selected within 60 days. The monitor(s) if they so choose, may attend this training.

a. The training shall include education concerning the Defendants' policies regarding reporting, investigating, and preventing sexual harassment, and the consequences for violating any policy concerning sexual harassment; and

b. In addition to roll call training, formal training sessions on sexual harassment shall be conducted on a quarterly basis for all years succeeding entry of this Court Order.

18. Within 90 days, an outside consultant, mutually agreed upon by the parties, shall develop a sexual harassment training program and materials and conduct training on sexual harassment for women prisoners so that women prisoners know how to recognize and report sexual harassment. The trainer shall be selected within 60 days.

a. The training materials must be included in the orientation that each woman receives upon intake or classification at each facility; and

b. Formal training sessions for women prisoners on sexual harassment shall be conducted on a monthly basis for the first year succeeding entry of the consent decree, and on a quarterly basis in all years thereafter that this decree shall remain in effect.

19. The Defendants shall make necessary alterations at both the Correctional Treatment Facility (CTF) and the Minimum Security Annex (Annex) within 60 days to ensure that women have privacy in their living, sleeping and shower areas.

## II. OBSTETRICAL AND GYNECOLOGICAL CARE

20. The Defendants shall hire within 60 days:

a. a nurse midwife in a half-time position who shall provide clinical and health educational services to the entire female prisoner population; and

b. an additional nurse practitioner or physician's assistant with special training in obstetrics and gynecology to provide clinical services to women prisoners at CTF.

21. The CTF OB/GYN Clinic shall maintain its current regularly scheduled hours.

22. The Defendants shall establish a prenatal clinic at CTF for women who receive their primary prenatal care at CTF. This clinic shall operate at least one half-day each week. Pregnant women shall not be required to make appointments for the prenatal clinic through the sick-call process, but rather, shall have scheduled appointments for the clinic.

23. The Defendants shall maintain statistics on the number of pregnant women and the birth outcomes of infants whose mothers delivered while incarcerated.

24. In addition to the general health interview and observation performed for male prisoners, the intake screening for all women prisoners shall include specific inquiry about her use of contraceptives or intrauterine devices, history of pregnancy, last known menstrual period, current likelihood and history

of sexually transmitted diseases and pattern of drug use (if applicable).

25. In accordance with DCDC policy, the Defendants shall inform all women prisoners of the procedure to access health services while incarcerated.

26. In addition to the health appraisal conducted for male prisoners, the Defendants shall conduct a gynecological examination, including a pelvic examination and evaluation, a breast examination accompanied by patient education, a PAP smear, a chlamydia and gonorrhea culture, and a serology for syphilis. In accordance with the CTF Operations manual and National Commission on Correctional Healthcare (NCCHC) and American Correctional Association (ACA) standards, this health appraisal shall occur within 14 days of admission into the DCDC, unless there is documentation of a complete and comparable health appraisal within the previous 90 days.

27. The Defendants shall develop and implement within 90 days, an appropriate health appraisal form to correspond with the ordered health appraisal for women noted in paragraph 26.

28. The Defendants shall develop and implement within 90 days, detailed written protocols concerning routine and follow-up care for common gynecological problems including syphilis, gonorrhea, chlamydia, and pelvic inflammatory disease; PAP tests; pelvic examinations; breast examinations; education in contraception and mammography for high-risk women, in accordance with the standards of the American College of Obstetrics and Gynecology (ACOG).

29. The Defendants shall provide gynecological care within the time frames and in a manner consistent with gynecological protocols that satisfy ACOG standards unless a physician determines that in his or her medical judgment it is not medically appropriate for such care to be provided in accordance with the protocol, in which case the reasons for this determination shall be entered into the patient's medical record.

30. At a minimum, the protocol concerning the provision of gynecological care shall provide that the Defendants shall offer and make available PAP tests to all high-risk women at CTF every six months.

31. The Defendants shall maintain a list of abnormal PAP results and, within seven days of receipt of an abnormal PAP result, shall notify the patient of the abnormal result and develop and initiate a course of treatment.

32. All women who receive an abnormal PAP test result shall be scheduled for a repeat PAP test at three-month intervals until the PAP test results are normal. Once the PAP test results are normal, a PAP test shall take place every six months. If a culdoscopy is required, it shall be performed in a manner and within time frames accepted as appropriate by ACOG standards.

33. The Defendants shall implement within 60 days a tracking system to insure that all women receive appropriate preventive gynecological care at regular intervals.

34. If a pregnancy test reveals that a woman is pregnant, routine prenatal care shall be initiated immediately.

35. The Defendants shall develop and implement a protocol concerning restraints used on pregnant and postpartum women which provides that a pregnant prisoner shall be transported in the least restrictive way possible consistent with legitimate security reasons. Specifically, the protocol shall provide:

a. The Defendants shall use no restraints on any woman in labor, during delivery, or in recovery immediately after delivery.

b. During the last trimester of pregnancy up until labor, the Defendants shall use only leg shackles when transporting a pregnant woman prisoner unless the woman has demonstrated a history of assaultive behavior or has escaped from a correctional facility.

36. The Defendants shall develop and implement within 90 days, a detailed written prenatal protocol for women who receive their primary prenatal care at CTF in accordance with ACOG standards. The protocol shall also provide guidelines to define "high-risk pregnancy." High-risk pregnancies shall be considered to include at a minimum

those women with histories of alcohol and drug abuse, sexually transmitted diseases, diabetes or anemia, older women, women with poor obstetrical histories, and women expecting multiple births.

37. The Defendants shall arrange for each pregnant woman prisoner to see an obstetrician at monthly intervals during the first two trimesters of her pregnancy, bi-monthly intervals during the seventh and eighth months, and weekly intervals during the ninth month. The Defendants shall arrange for women who are experiencing high-risk pregnancies to see an obstetrician at shorter than routine intervals until it is determined that the pregnancy is progressing normally.

38. The Defendants shall implement a tracking system to insure that all pregnant women are scheduled and seen regularly for prenatal care.

39. The Defendants shall permit a woman prisoner to feed her baby at D.C. General Hospital while the woman prisoner and baby remain at D.C. General Hospital.

40. The Defendants shall develop a routine visiting program for women whose children remain in D.C. General Hospital. These women shall be allowed to visit their children at D.C. General Hospital every day.

41. In accordance with the Defendants' Department Order, pregnant women prisoners shall receive counseling regarding child placement as soon as the pregnancy is known.

42. The Defendants shall designate a representative who shall develop and maintain contacts with licensed child-placing agencies, including the Department of Human Services. The Defendants shall provide training to its social workers on the range of options available for child placement, including third-party placement with family or friends, foster-care placement, and adoption. Each woman shall be given information about each of the options.

43. The nurse midwife shall implement within 90 days an obstetrical and gynecological health education program that satisfies a recognized national medical standard. Education material should also be made available in the CTF library. The Defendants shall maintain adequate documentation on the program so that it can be evaluated by the Court within 60 days after implementation.

44. The Defendants shall have at least one medical staff member available at CTF 24 hours each day.

45. CTF medical personnel shall have telephone access to the OB/GYN physician at CTF during evening and weekend hours.

46. If a woman prisoner is in need of emergency obstetrical or gynecological care during evening or weekend hours, she shall be taken immediately to the emergency area in the OB/GYN clinic at D.C. General Hospital, unless employees providing obstetrical and/or gynecological care at D.C. General Hospital determine that the main emergency room at D.C. General Hospital would be more medically appropriate.

47. The Defendants shall provide each woman prisoner who is discharged from custody with the following:

a. a supply of essential medications that will last until she may be reasonably expected to obtain necessary follow-up care in her community; and

b. referrals to services in the community to insure continuity of care.

48. If a woman is released prior to the time that results of any gynecological or obstetrical tests are received by CTF medical personnel, the Defendants shall forward the test results to her last known mailing address.

49. The Defendants shall provide sufficient resources to insure that prisoners are transported to medical appointments in a timely fashion, including a sufficient number of security staff to transport prisoners, appropriate and sufficient transport vehicles, and appropriate waiting areas.

50. The Defendants shall modify their transportation procedures so that the transportation system alone does not cause women prisoners to wait for more than one hour at D.C. General Hospital before receiving medical care.

51. If a woman prisoner misses a medical appointment for any reason, the Defendants shall reschedule the appointment for the earliest available date. The Defendants shall use their best efforts to insure that the rescheduled appointment occurs within a medically appropriate period of time.

52. The Defendants shall comply fully with all provisions of the Memorandum of Understanding between the DCDC and D.C. General Hospital.

53. The Defendants shall assign a physician, or a member of the medical staff at CTF, who provides obstetrical or gynecological care, to serve as a liaison between CTF medical personnel and D.C. General Hospital.

54. The Defendants shall maintain the content of each medical record in an orderly and confidential manner.

55. For all pregnant women prisoners, the Defendants shall maintain a medical chart on the POPRAS form pregnancy chart, or an equivalent form, together with a regular medical chart. All medical visits to or by the responsible physician or primary healthcare provider, orders for laboratory tests, laboratory test results and other notes and orders relating to the medical care of pregnant women prisoners shall be recorded on the POPRAS form or consultation form.

56. The Defendants shall develop and implement within 90 days, a new consultation form that provides adequate clinical information to D.C. General Hospital and insures that adequate information is provided by D.C. General Hospital to CTF medical personnel.

57. The Defendants shall institute, maintain and follow a system to coordinate the implementation and tracking of physician orders so that gynecological and obstetrical care will be provided within a timely fashion. The system shall coordinate all orders regardless of whether the physician orders are to be filled inside or outside the facility. This system shall be reflected in written procedural guidelines, a copy of which shall be provided to counsel for Plaintiffs within 60 days. Orders for medication are not to be tracked under this system.

58. Documentation shall be required whenever CTF medical staff elect not to follow the instructions of a consulting physician at D.C. General Hospital or elsewhere. This documentation should include the justification for not providing the therapy ordered. Only medically-based justifications shall be permissible.

59. For all women prisoners who are discharged from D.C. General Hospital or other medical facilities to CTF, CTF medical personnel shall promptly obtain a discharge summary and maintain the summary in the prisoner's medical record.

60. Prisoners shall receive notice of results of laboratory or diagnostic tests which are of no clinical significance within seven calendar days of the date the facility receives the results of such test.

61. In the case of non-emergency abnormal laboratory or diagnostic test results of clinical significance, the prisoner will be seen by the ordering physician, or if that physician is unavailable, by the Medical Officer, within 24 hours of the time the facility receives the results of such test. At such time the physician will explain the result to the patient and order such follow-up care as is appropriate.

62. The Defendants shall require a woman prisoner who refuses medical care to do so in the presence of a licensed medical staff member who can answer the patient's questions and counsel the patient concerning the consequences of a refusal. In accordance with DCDC policy regarding quality assurance, the reasons for refusal shall be analyzed regularly as part of a comprehensive and up-to-date quality assurance program. This quality assurance activity shall be documented.

### III. *PROGRAM EVALUATION*

63. The Defendants shall provide diagnostic evaluations for women prisoners similar to those currently provided for men in the Reception and Diagnostic Unit at CTF to determine women prisoners' needs, interests, and requirements for increased programs and opportunities in academic and higher education, vocation, work, religion and recre-

ation. The procedure for the needs assessment shall be done by an approved scientific method. These evaluations shall be completed within 30–45 days of a female prisoner's transfer to CTF or the Annex. The evaluations shall include educational testing, vocational testing and psychological testing. The Defendants shall provide women with the appropriate programming called for by this evaluation within 60 days of their arrival at the facility.

64. The Defendants shall coordinate the scheduling of academic educational classes, higher education classes, vocational training, recreation time and activities, law library hours, and work in prison details for women in such a manner as to maximize women prisoners' participation in as many areas as possible.

65. The Defendants shall provide sufficient program space so that women prisoners can participate in equal and adequate programs and services as compared to men prisoners. The Defendants shall provide at least two additional trailers at the Annex (with functional sanitary facilities) to allow for additional programming activities. Within 30 days, the Defendants may submit for the Court's consideration an alternative to the 2 ordered trailers.

66. The Defendants shall develop and implement quality assurance programs for monitoring program delivery to ensure the continued provision of equal and adequate programs to women prisoners.

67. The Defendants shall increase the number of staff posted or detailed at the women's unit at CTF and at the Annex to ensure that women prisoners are escorted to educational programs, recreation, employment, and medical care as scheduled. Sufficient staff shall be provided in a manner that does not prevent the programming staff from performing any of their duties.

68. The Defendants shall provide women prisoners at the Annex with a range of academic education programs that is equivalent to the range of academic programs provided to male prisoners at the Minimum Security Facility (Minimum).

69. The Defendants shall provide women prisoners at CTF with a range of academic education programs that is equivalent to the range of academic programs provided to male prisoners at the Occoquan, Central and Medium facilities.

70. Women prisoners at the Annex and CTF shall be provided with the opportunity for full-time (five hours per day, five days per week) basic education to include ABE, GED, and Special Education classes. The Defendants shall immediately provide two full-time basic education teachers for ABE, GED, and Special Education classes at the Annex.

71. Women prisoners at CTF shall have access to on-site higher education programs which shall include a four-year B.A. and/or B.S. degree program, an A.A. degree program, a certification program, and a precollege program. The bachelor and associate programs shall be offered in a variety of fields, and at a minimum shall each offer three different areas of study leading to a degree. Within 90 days, the Defendants shall at least make the University of the District of Columbia B.A. and A.A. programs available to women prisoners at CTF.

72. The Defendants shall offer women prisoners financial arrangements for these education programs that are the same as those arrangements available to similarly situated male prisoners.

73. The Defendants shall immediately provide women prisoners at CTF with at least 30 hours of access per week to the Atlantic Union computers. Women shall be scheduled to access the computer during educational program time and during free time, including evenings and weekends. Women prisoners shall be provided with an amount of computers sufficient to meet their needs.

74. The Defendants shall immediately process the applications for Atlantic Union in a complete and timely manner. Women shall be provided with all books and course materials before the start of a course. The women shall receive substantive tutorial guidance in the course work from qualified educators.

75. The Defendants shall immediately provide appropriate substitute teachers or

instructors during absences of regular teachers or instructors of more than three working days. The provision of a substitute teacher or instructor shall not result in consolidating two classes into one or increasing the class size.

76. The Defendants shall provide women prisoners at CTF with a range of vocational education programs that is equivalent to the range of vocational education programs provided to male prisoners at the Occoquan, Central and Medium facilities.

77. The Defendants shall provide women prisoners at CTF with two prevocational programs each to be at least six weeks in duration. Prevocational programs include those courses which teach personal development skills, living skills, and/or employment skills such as Employment Techniques, Awareness and Preparation (ETAP) and Lifeskills.

78. The Defendants shall provide women prisoners at CTF with a minimum of four vocational education programs, including the one program currently in place (DocuTech). These programs shall be available to female prisoners of all custody levels. A vocational education program is any program of 12 to 24 months of duration that teaches employable skills and contains both a classroom component and an on-the-job-training component. Two programs shall be operative within 120 days of the entry of this Order.

79. The Defendants shall provide women prisoners at CTF with at least two apprenticeship programs as defined by Department order.

80. All prevocational programs, vocational programs, and apprenticeships added for women prisoners at CTF shall have the potential for providing women with job skills marketable in the local labor market. An important consideration in the Defendants' selection of programs shall be the wage-earning capacity upon completion of the program.

81. The Defendants shall conduct affirmative outreach to women during the enrollment period for vocational training. This outreach shall entail DCDC staff meeting with women at least one month before the deadline for program enrollment to inform

the women that the new programs are available and to offer a full description of the available programs and any applicable criteria for participation.

82. The Defendants shall ensure that all contractual programs used to provide services to women prisoners are compatible with and fulfill the provisions of this Order.

83. The Defendants shall provide women prisoners at the Annex with a range of work opportunities that is equivalent to the range of work opportunities provided to male prisoners at Minimum.

84. The Defendants shall provide women prisoners at CTF with a range of work opportunities that is equivalent to the range of work opportunities provided to male prisoners at the Occoquan, Central and Medium facilities.

85. The Defendants shall employ capable women prisoners on all work details available at the facility where women prisoners are housed. These details shall include maintenance and trades, such as plumbing, carpentry, and electrical.

86. The Defendants shall offer equivalent industrial opportunities by establishing at least two industries at CTF or by transporting women prisoners from CTF to the industries at the Central Facility to perform industrial work. Within 60 days, the Defendants shall submit to the Court plans for the implementation of an industrial program for CTF women prisoners.

87. The Defendants shall revise the guidelines and practices for work training eligibility within 30 days to take into account the different sentence structure of female offenders and to permit women's maximum participation in work training.

88. The Defendants will immediately provide a work training program to all women prisoners who are eligible under the revised guidelines, including those who are housed at CTF as stated in the CTF Operations Manual.

89. Within 30 days of entry of this Order, the Defendants shall complete and submit work training packets for each woman pris-

oner eligible for work training and expedite the approval process.

90. The Defendants shall submit required paperwork for work training approval 45 days prior to a woman prisoner's eligibility date in order to complete the process by the date of eligibility. In the event that a woman arrives at the institution with less than 45 days until she is eligible for work training, the Defendants shall expedite the paperwork.

91. The Defendants shall not deny a woman prisoner the opportunity to participate in work training based on her arrival at the Annex or classification to minimum custody status within the previous 90 days or because of her impending eligibility for halfway house placement or parole.

92. The Defendants shall provide adequate staff, including case managers and vocational development specialists, to enable the women prisoners to be informed of their work training eligibility and to complete the necessary paperwork in the required time frame.

93. The Defendants shall staff a sufficient number of vocational development specialists at the Annex in order to conduct testing, classes and counseling; completes necessary paperwork and develop jobs, including nontraditional employment, and transport women to interviews. The Defendants shall provide the vocational development specialist(s) with an appropriate vehicle for transporting women to job interviews and for performing job development activities.

94. The Defendants shall provide women prisoners at the Annex with recreational opportunities that are equivalent to the recreational opportunities provided to male prisoners at Minimum.

95. The Defendants shall provide women prisoners at CTF with recreational opportunities that are equivalent to the recreational opportunities provided to male prisoners at the Occoquan, Central and Medium facilities.

96. The Defendants shall immediately provide all women prisoners at CTF, including pregnant prisoners subject to medical approval, with recreation seven days per week for at least five hours per day. Women shall have the option of going outside or to indoor recreation facilities during this time period. This recreation schedule shall be effective at CTF within 30 days of this Order.

97. Women shall be given access to the same variety of recreation activities as are available to men, including large group events, intramurals, arts and crafts and drama activities.

98. The Defendants shall immediately open the recreation trailer at the Annex for at least 8 hours per day, 7 days a week. Correctional officers shall open and supervise the trailer when the recreation specialist is off duty. The recreation specialist shall not be assigned or pulled away from her duties as a recreation specialist for the women at the Annex, except in the case of an emergency.

99. The Defendants shall improve the Annex grounds by adding a basketball court, volleyball pit, and outdoor tables.

100. The Defendants shall provide women prisoners at the Annex with a range of religious programs and services that are equivalent to the range of religious programs provided to male prisoners at Minimum.

101. Within 60 days, the Defendants shall provide chaplaincy services to women prisoners at the Annex for 5 days per week through a staff chaplain, volunteer chaplain, or a combination of chaplain staff members. The chaplain's hours shall include evening hours during the week to accommodate those women working on details, industry, or in the community.

## IV. *ENVIRONMENTAL HEALTH*

102. Within one year, the Defendants shall reduce the population of Annex Dormitories 6 and 7 so that no more than 90 women are housed in the two dormitories combined.

103. Within one year, the Defendants shall repair or replace the roofs of Annex Dormitories 6 and 7 and retain them in a watertight condition.

104. Within 90 days, the Defendants shall repair the Annex dormitories so as to prevent the entry and refuge of vermin and shall conduct a vermin eradication program to

eliminate the present infestation of vermin. The Defendants shall thereafter promulgate and follow an effective vermin eradication program.

105. Within 60 days, the Defendants shall provide each woman prisoner housed in the Annex dormitories at least one vertical locker and one footlocker.

106. Within 30 days, the Defendants shall replace all torn mattresses and pillows at the Annex with clean, untorn, fire-retardant mattresses and pillows. The Defendants shall conduct a regular inspection of all mattresses and pillows and shall, at that time, immediately replace any mattresses that are damaged to a degree that prevents adequate cleaning.

107. The Defendants shall immediately use cart liners or disposable or washable laundry bags to transport laundry at the Annex.

108. For as long as the Annex dormitories are double-bunked, the Defendants shall, within 60 days, provide a minimum of 20 foot candles of prisoner-controlled light to each bunk.

109. Effective immediately, the Defendants shall ensure that all housing units at the Annex are issued a timely, adequate and appropriate amount of cleaning supplies.

110. Within 60 days, the Defendants shall connect the toilets and handsinks in every Annex trailer.

111. The Defendants shall continue to provide sufficient and readily accessible sanitary facilities for women in the industries at the Central Facility.

112. Within 90 days, the Defendants shall improve the ventilation at the Annex dormitories, the print shop and the garment shop so that the quality of air in these areas is brought up to an acceptable level.

113. Within 90 days, the Defendants shall install a drainage system at the Annex which will prevent hazardous accumulations of water.

114. The Defendants shall promulgate and follow a written preventive maintenance plan for the Annex dormitories, the Annex trailers, and the Annex grounds.

115. Three times every year, the Defendants shall cause the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) to inspect the Annex for compliance with the requirements of environmental sanitation and maintenance and food service delivery (at the main Minimum compound). The first such inspection shall be conducted within 45 days of the date of this Order. Within 30 days of each inspection, the Warden of Minimum shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy any unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

116. Within 90 days, the Defendants shall hire a qualified air balancing contractor to service the CTF air handling system so that it provides an acceptable level of air quality to all areas of the facility inhabited by prisoners.

117. In the event that the air balancing and other recent repairs to the heating system at CTF fail to maintain a minimum cell temperature of 65°F in every cell, measured at the perimeter wall, the Defendants shall immediately

a. cease housing women in the end cells of each tier;

b. provide each woman prisoner with two extra blankets, two pairs of thermal underwear, and two pairs of wool socks;

c. explore means of insulating or heating the perimeter walls of the cells; and

d. report back to the Court.

118. The Defendants shall develop and implement an effective rodent prevention program.

119. Effective immediately, the Defendants shall ensure that all housing units at CTF are issued a timely, adequate and appropriate amount of cleaning supplies.

120. The Defendants shall use cart liners or disposable or washable laundry bags to transport laundry between CTF and the Jail.

121. Effective immediately, the Defendants at CTF shall monitor the food temper-

ature and delivery times of all foods, including special diet meals, delivered to the satellite kitchen.

122. The Defendants shall promulgate and follow a written preventive maintenance plan for the CTF that includes maintenance of structures, systems, and equipment.

123. The Defendants shall ensure that the correctional officers inspect all plumbing fixtures on each shift, and shall ensure that any plumbing fixture that requires repair will be reported immediately upon discovery, and repaired immediately. The Defendants shall maintain logs demonstrating compliance with this requirement.

124. Three times per year, the Defendants shall cause the District of Columbia DCRA to conduct inspections of the CTF for compliance with the requirements of environmental sanitation, maintenance and food service delivery. The first such inspection shall be conducted within 45 days of the date of this Order. Within 30 days of each inspection, the Warden of CTF shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy any unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

## V. *FIRE SAFETY*

125. Within 120 days, the Defendants shall install and maintain a manual fire alarm system and fire detection system which covers all areas used by women prisoners at Minimum, including the Annex dormitories. The fire detection system must include smoke detectors in all sleeping and dayroom areas, and smoke or heat detectors in all other areas. There must be an automatic retransmission of the above systems to a constantly attended location outside of the dormitory buildings. There must also be a control panel to provide emergency power or to send a warning if the system is not operational.

126. The Defendants must repair or replace the fire alarm system in the Administration building, the cafeteria and gymnasium at the Minimum main compound.

127. The Defendants must install a sprinkler system in the Annex dormitories and provide a 20–minute fire-rated enclosure of storage rooms located in both dormitories.

128. The Defendants shall ensure that all bed linens, blankets, and curtains or draperies in the Annex dormitories are of fire-retardant material.

129. Effective immediately, in each Annex dormitory, the Defendants shall conduct fire drills 12 times per year, 4 times per shift, and shall keep written documentation of all such drills.

130. The Defendants shall conduct and document mandatory semi-annual training on fire safety procedures for all correctional officers.

131. Effective immediately, and in accordance with Department Order No. 2920.1A, the Defendants shall:

a. conduct weekly inspections of all building and grounds for fire hazards, and document such inspections;

b. conduct quarterly inspections of all fire safety equipment, and document such inspections; and

c. ensure that the Institutional Fire Marshal conducts quarterly inspections of the Facility.

132. Effective immediately, and in accordance with Department Order No. 2920.1A, the District of Columbia Fire Department shall conduct fire safety inspections of the Annex not less frequently than every 12 months. The Warden of Minimum shall obtain the Fire Department's report within 10 days and promptly give a copy to the Plaintiffs' counsel. Thereafter, the Warden shall cause any fire safety deficiencies identified in the Fire Department's report to be remedied within 30 days, or shall provide a report to the Fire Department as to why the deficiency cannot be so remedied and provide a plan to remedy the deficiency within a further period of time not to exceed 90 days.

133. Within 30 days, the Defendants at CTF shall repair the water leakage from rain, particularly in the vicinity of the high-voltage electrical conduit in the culinary storage room located in the CTF basement.

134. At CTF, the Defendants shall maintain the storage in the culinary storage room in a manner that does not prevent the sprinkler heads from functioning adequately.

135. At CTF, the Defendants shall maintain the sprinkler system and test it quarterly and they shall test the fire pump annually.

136. At CTF, the Defendants shall conduct fire drills 12 times per year, 4 times per shift, and shall keep written documentation of all such drills.

## VI. *GENERAL*

137. This Order shall continue in full force and effect, absent modification by the Court, until the Defendants have complied with all provisions for 5 years.

138. Plaintiffs are awarded the costs of this suit, and reasonable attorneys' fees.